494 F.2d 1087
 161 U.S.App.D.C. 168, 73 Lab.Cas. P 14,340
 LOCAL UNION NO. 2188, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Western Electric
Company, Inc., Intervenor.
LOCAL UNION NO. 1974, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Western Electric
Company, Inc., Intervenor.
 Nos. 72-1994, 72-1995.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Dec. 6, 1973.
Decided Feb. 28, 1974.
 
 Laurence J. Cohen, Washington, D.C., with whom George Kaufmann, Washington, D.C., was on the brief, for petitioners.
 Jonathan G. Axelrod, Atty., N.L.R.B., with whom John S. Irving, Jr., Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Acting Gen. Counsel and Joseph E. Mayer, Atty., N.L.R.B., were on the brief for respondent. Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., at the time the record was filed also entered an appearance for respondent.
 Lawrence M. Joseph, New York City, was on the brief for intervenor.
 Gerard C. Smetana, Chicago, Ill., filed a brief on behalf of the Chamber of Commerce of the United States of America, as amicus curiae urging affirmance. Burt A. Braverman, Alexandria, Va., entered an appearance for the Chamber of Commerce of the United States as amicus curiae.
 Before McGOWAN, TAMM and MacKINNON, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 The petitions in these consolidated cases[1] seek review of two separate decisions of the National Labor Relations Board each of which invokes the Board's policy of deference to the process of arbitration. In No. 72-1994, Local 2188, IBEW v. NLRB and Western Electric Co. and No. 72-1995, Local 1974, IBEW v. NLRB and Western Electric Co., the Board has declined to reach the merits of unfair labor practice complaints against Western Electric Co. because contracts between the parties provide for grievance and arbitration procedures. Since the facts of these two cases are virtually identical, they will be discussed together.
 
 I.
 
 2
 Both cases arise from disputes regarding certain organizational changes at two plants of the Western Electric Company at Omaha, Nebraska and Shreveport, Louisiana. In 1969, the Omaha employees were restructured into three 'manager's organizations' whereas there had formerly been only two such groups. In 1970, a similar change was made at the Shreveport plant, creating two manager's organizations in place of one. The significance of these changes, for present purposes, is that the contractual provisions governing movement of personnel (i.e. promotion, downgrading and lateral transfer) at both plants are keyed to the concept of a manager's organization. For example, an employee can be considered for transfer within his manager's organization, but cannot ordinarily move from one manager's organization to another. Section 2.1(c) of Article 27 of the Omaha contract is illustrative:
 
 
 3
 When a vacancy occurs, employees of the Company who have qualifications for the vacancy will be considered in successive steps in the following order until the vacancy is filled:
 
 
 4
 . . . .ncy
 
 
 5
 (c) Graded employees in successively lower grades from within (1) the Assistant Manager's organization having the vacancy for vacancies in grade 34 and lower, or (2) the Manager's organization having the vacancy for vacancies in grade 35 and higher or in the JOURNEYMAN TRADES OCCUPATIONS or JOURNEYMEN from within the Manager's organization having the vacancy.
 
 
 6
 Similar provisions are found in the section governing layoffs. The union argues that as a result of the company's organizational changes, a literal reading of the words 'manager's organization' will drastically affect seniority rights of employees since each worker's field of movement will be restricted to the new, smaller manager's organizations. The union does not contest management's right to reorganize the plants but urges that the employee movement provisions should be applied as if the Omaha plant still had only two manager's organizations and the Shreveport plant still had only one. The Company insists upon a literal reading of the words 'manager's organization' and plans to administer employee movement on the basis of the new organizational structure at each plant. As a result of this impasse, each local filed unfair labor practice charges, alleging that the company has unilaterally changed the working conditions of its employees in violation of section 8(a)(5) of the National Labor Relations Act. In each case the Board dismissed the complaint, noting that the dispute involves a matter covered by the grievance and arbitration procedures contained in the labor contract. In both cases the Board retained jurisdiction for the limited purpose of entertaining a motion for further consideration upon a showing that either: (a) the dispute has not been resolved or submitted to arbitration; or (b) the grievance and arbitration procedures have not been fair and regular or have reached a result repugnant to the National Labor Relations Act.
 
 II.
 
 7
 The Board's disposition of these two cases followed the rule established by its decision in Collyer Insulated Wire, 192 NLRB 837 (1971). In that case, like the present one, the union had charged the employer with effecting a unilateral change in working conditions. The employer defended the charge on the ground that its actions were authorized by the contract. Alternatively, the employer argued that the dispute ought to be resolved under the grievance and arbitration procedures contained in the contract. The Board agreed:
 
 
 8
 We find merit in Respondent's exceptions that because this dispute in its entirety arises from the contract between the parties, and from the parties' relationship under the contract, it ought to be resolved in the manner which that contract prescribes. We conclude that the Board is vested with authority to withhold its processes in this case, and that the contract here made available a quick and fair means for the resolution of this dispute including, if appropriate, a fully effective remedy for any breach of contract which occurred. We conclude, in sum, that our obligation to advance the purposes of the Act is best discharged by the dismissal of this complaint.
 
 
 9
 Id. at 839.
 
 
 10
 It should be understood that the Collyer decision and those now under review are not based upon any right of the employer to compel the union to utilize grievance procedures rather than file charges with the Board. Rather, they proceed from the Board's asserted power to withhold its processes when to do so will best serve the policies of the Federal labor laws. The Collyer doctrine has been applied by the Board in numerous subsequent cases and has received judicial approval in the Second Circuit. Nabisco, Inc. v. NLRB, 479 F.2d 770 (2d Cir. 1973).
 
 
 11
 The union attacks the present dismissals on alternative grounds. It is argued: first, that the Collyer doctrine is an illegal abdication of the Board's duty to remedy unfair labor practices; and, second, that even if Collyer is valid, it was erroneously applied in these two cases. Both arguments must fail.
 
 
 12
 First of all, the Collyer rule of deferral to grievance and arbitration procedures is clearly valid.[2] It is well established that the Board may decline to take jurisdiction of a complaint if, in its judgment, Federal labor policy is best served by leaving the parties to voluntary settlements. This principle has been approved in this Circuit, Office & Professional Employees Local 425 v. NLRB, 136 U.S.App.D.C. 12, 419 F.2d 314 (1969), and cited with approval by the Supreme Court. NLRB v. Plasterers' Union, 404 U.S. 116, 136-137, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971); Carey v. Westinghouse Corp., 375 U.S. 261, 270-271, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), quoting International Harvester Co., 138 NLRB 923, 925-26 (1962), aff'd sub nom. Ramsey v. NLRB, 327 F.2d 784 (7th Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). See also Smith v. Evening News Ass'n, 371 U.S. 195, 198 n. 6, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). These authorities contemplate Board deference to arbitration awards issued before the filing of unfair labor practice complaints. Collyer and the decisions under review go a step further, however. In these cases the Board dismissed unfair labor practice complaints even though arbitration had not been initiated. Collyer is not the familiar case of deferral to an arbitration award, but deferral to the arbitration procedure which is available but not yet invoked. Like the former class of cases, the Collyer decision relies upon the Federal labor policy expressed in section 203(d) of the Labor Management Relations Act:
 
 
 13
 Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.
 
 
 14
 We believe that this declaration of policy applies in the pre-arbitral (Collyer) context as well as in the post-award context. We also believe that this policy supports pre-arbitral deferral since the grievance and arbitration procedure is the only remedy left to a party from whom the Board withholds statutory relief. It should be clear, however, that the fostering of one policy may be detrimental to another policy, viz.: that expressed by the Congress in granting the Board power to remedy unfair labor practices. Certainly the Board appreciated this ambivalence in its Collyer opinion:
 
 
 15
 Thus, this case like each such case compels an accommodation between, on the one hand, the statutory policy favoring the fullest use of collective bargaining and the arbitral process and, on the other, the statutory policy reflected by Congress' grant to the Board of exclusive jurisdiction to prevent unfair labor practices.
 
 
 16
 192 NLRB at 841. We read the Collyer doctrine as a balancing rule which requires deferral to arbitration only where a balance of both supporting and antagonistic policies favors deferral. The operation of this balancing process is demonstrated by the Collyer opinion itself. There the Board considered five factors bearing upon the probable effectiveness of arbitration to advance Federal labor policy:
 
 
 17
 1. the history and quality of the parties' collective bargaining relationship;
 
 
 18
 2. the absence of anti-union animus;
 
 
 19
 3. willingness of the respondent party to arbitrate;
 
 
 20
 4. the scope of the arbitration clause;
 
 
 21
 5. suitability of the dispute to resolution by arbitration. Id. at 842. In Collyer all of these considerations favored deferral. Elaborating on the fifth point, the Board noted that the factual bases of the statutory claim and of the contractual dispute were so intertwined that resolution of the contractual issue by arbitration might be dispositive of the statutory (unfair labor practice) issue: The contract and its meaning in present circumstances lie at the center of this dispute. In contrast, the Act and its policies become involved only if it is determined that the agreement between the parties, examined in the light of its negotiating history and the practices of the parties thereunder, did not sanction Respondent's right to make the disputed changes . . .. That threshold determination is clearly within the expertise of a mutually agreed-upon arbitrator.
 
 
 22
 192 NLRB at 842. This congruence between the contractual dispute and the overlying unfair labor practice charge is significant. If it were not present, the Board's abstention might have constituted not deference, but abdication.
 
 
 23
 Our endorsement of the Collyer rule would be incomplete without one further comment. While the Board's promise to overrule arbitration awards which are irregular or repugnant to the Act is a necessary condition to the legality of pre-arbitral deferrals, it is not a sufficient one. Put another way, the fact that any ultimate award must conform to the policies of the Act does not guarantee that deferral itself is consistent with the Act. Pre-arbitral deferral might constitute an effective denial of any remedy if, for example, arbitration of the dispute would impose an undue financial burden upon one of the parties. Dismissal of the complaint in such a case would be contrary to the policies of the Act although all other criteria for application of the Collyer doctrine are met.[3] Deferral might also be unjustified where it prevents an orderly exposition of the law in question. Successive arbitration awards could produce a variety of ad hoc solutions to the same problem, all consistent with the Act, but no uniform rule. In such circumstances further abstention by the Board might be contrary to Federal labor policy.
 
 
 24
 Having approved the Collyer decision, it remains for us to determine whether the principle of that case was properly applied in the cases at hand. We note, first of all, that the results of an arbitration will very likely be dispositive of the unfair labor practice issue: if the award adopts the union's construction of the term 'manager's organization' for purposes of the Articles governing 'Movement of Personnel', then the company's compliance with this decision would moot the instant unfair labor practice complaints; if the company's construction prevails, of course, there will be no basis for the charge of unilateral action. This likelihood alone strongly supports the Board's decision to dismiss the complaint pending the outcome of grievance and arbitration proceedings. Examination of the other factors considered in Collyer does not dissuade us from this view. The dispute is clearly within the scope of the grievance and arbitration procedures at both the Omaha and the Shreveport plants.[4] The company has expressed its willingness to arbitrate.[5] There is no suggestion of anti-union animus such that deferral to arbitration would be a futile gesture; nor does the history of the collective bargaining relationship of the parties indicate that arbitration would not be fruitful. We cannot conclude that the Board has abused its discretion by referring the parties in these cases to the grievance and arbitration procedures provided in their contracts.
 
 
 25
 Petitions denied.
 
 
 
 [1]
 These proceedings were consolidated by order of this court on November 28, 1972
 
 
 [2]
 Another panel of this Court has reached the same conclusion in a somewhat different case. Associated Press v. NLRB, 160 U.S.App.D.C. , 492 F.2d 662 (1974)
 
 
 [3]
 A similar concern was expressed by Board Member Jenkins in his dissent from the Collyer decision. 192 NLRB at 854-55
 
 
 [4]
 Shreveport Contract, Article 10, P1, Article 11, P1, I J.A. at 414-15; Omaha Contract, Article 9, P1, Article 10, P1, II J.A. at 574, 576
 
 
 [5]
 Letter from Mr. T. H. Jackson to Mr. J. A. Burnett, February 18, 1971, I J.A. at 406; Trial Examiner's Decision at 15, II J.A. at 24. The initial refusal of the Omaha management to arbitrate was apparently based on its mistaken belief that the union was challenging its right to reorganize the plant. As we have noted, the union's only complaint concerns the interpretation of contract provisions governing movement of personnel