James **BANYARD**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,

**McLean Trucking Company, Intervenor.**

Clay D. **FERGUSON**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

Nos. 73–1609, 73–1610.

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1974.

Decided Aug. 14, 1974.

Arthur L. Fox, II, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for petitioners.

Patrick Hardin, Associate Gen. Counsel, National Labor Relations Board, with whom John S. Irving, Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, were on the brief, for respondent.

Melvin R. Manning, Richmond, Va., for intervenor.

Before WRIGHT, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

These consolidated petitions [1] for review of orders [2] of the National Labor Relations Board call into question the Board's application of its *Spielberg* [3] and *Collyer* [4] doctrines. Because we find the Board has erroneously applied those doctrines in these cases, we remand for further proceedings.

## I.

*Banyard's Case*

James Banyard worked as a truck driver for McLean Trucking Company and its predecessor for 22 years and also served as the Union's [5] appointed shop steward since 1955. He was fired on 7 October 1969 for refusing to drive a truck admittedly overloaded in violation of Ohio state law.[6] At the time of his

---

1. These proceedings were consolidated by order of this court on 22 May 1974.

2. McLean Trucking Co., 202 NLRB No. 102, 82 L.R.R.M. 1652 (23 March 1973); Roadway Express, Inc., 203 NLRB No. 25, 83 L.R.R.M. 1149 (25 April 1973).
Our jurisdiction to review these orders is provided by section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f).

3. Spielberg Manufacturing Co., 112 N.L.R.B. 1080 (1955).

4. Collyer Insulated Wire, 192 N.L.R.B. 837 (1971).

5. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 407.

6. The parties stipulated that Ohio law prohibited a weight exceeding 19,000 pounds plus three percent tolerance on the drive axle, and/or a weight exceeding 32,000 pounds plus three percent on the trailer axle. The trial examiner found that the 6

discharge there was in effect between the Company and the Union the National Master Freight Agreement and the Central States Area Local Cartage Supplemental Agreement. Article 16 of the contract provided that employees would not be required to violate any applicable statute or a governmental regulation relating to safety.[7]

On 6 October 1969 Banyard was dispatched to pick up 800 fifty-pound sacks of breading at Specialty Products Company in Cleveland. He was reluctant to haul what he considered an overweight load, but when he expressed his reluctance to a Specialty employee, he was told that he would have to call his dispatcher if he wanted to reduce the size of the load. Banyard telephoned the dispatcher and was told to "load the front end light and the back end heavy, and . . . bring it in."[8] He loaded the truck and again telephoned the terminal. When he refused to "bring it in," he was instructed to drop the trailer and return to the terminal. He was discharged the following day.

Pursuant to Articles 8, 42, and 43 of the contract, the Union had prosecuted Banyard's grievance through two stages of grievance procedure when on 2 January 1970 Banyard filed a charge with the National Labor Relations Board alleging violation by the Company of sections 8(a)(1) and (3) of the National Labor Relations Act of 1947.[9] On 23

July 1970 the trial examiner concluded that although the grievance proceedings were under way, there was no award for the Board to recognize. He went on to find that Banyard's discharge violated sections 8(a)(1) and (3) of the Act.

Although the Company filed timely exceptions, the Board reached no decision until after the Union's claim had been denied at the final stage of the contract grievance procedure.[10] On 23 March 1973 the Board dismissed the unfair labor practice complaint, deferring to the decision of the National Grievance Procedure under *Spielberg.*

*Ferguson's Case*

Clay D. Ferguson worked as an over-the-road driver for Roadway Express, Inc., for nine years.[11] He was fired on 24 March 1972 for refusing to drive a truck which he asserted was unsafe. At the time of Ferguson's discharge there was in effect between the Company and the Union the National Master Freight Agreement and the Carolina Freight Council Over the Road Supplemental Agreement. Article 16 of the contract provided that employees would not be required to operate vehicles not in safe operating condition.[12]

On 20 March 1972 Ferguson was assigned a tractor to drive from Nashville, Tennessee, to Columbia, South Carolina. Finding it difficult to hold the road— and therefore believing the truck to be

October shipment was in excess of the lawful weight under Ohio law and that Banyard did in fact refuse to pull an overload on that date. App. 27. (Citations to the record hereafter will be indicated as follows: "App." refers to the Appendix to the parties' briefs; "Tr." refers to the transcript of proceedings before the trial examiner.)

7. Article 16 provides in relevant part:
   The Employer shall not require employees to take out on the streets or highways any vehicle that is not in safe operating condition or equipped with the safety appliances prescribed by law. It shall not be a violation of this agreement where employees refuse to operate such equipment unless such refusal is unjustified. . . . Under no circumstances will an employee be required or assigned to en-

gage in any activity involving dangerous conditions of work or danger to person or property or in violation of any applicable statute or court order, or in violation of a government regulation relating to safety of person or equipment.

8. Tr. at 88–89.

9. 29 U.S.C. §§ 158(a)(1) and (3).

10. In the meantime, the Board announced its decision in Collyer Insulated Wire, note 4 *supra.*

11. Ferguson was a member of International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 391.

12. *See* note 7 *supra.*

unsafe—he hailed a second Roadway driver who happened by and asked him to road test the tractor for possible defects. When the second driver confirmed the danger,[13] Ferguson proceeded with caution to Hageman's, a nearby truck stop, and telephoned his dispatcher who instructed him to allow the Hageman's mechanic to road test the vehicle. When the mechanic also expressed doubt over the vehicle's safety,[14] Ferguson again telephoned his dispatcher, refusing to proceed any farther, and was told to wait at Hageman's for Roadway personnel. Roadway sent a safety supervisor and a mechanic, both of whom indicated that the vehicle was safe, but Ferguson still refused to drive. Pursuant to Ferguson's request, a Department of Transportation Safety Investigator arrived, inspected (but did not drive) the tractor, and stated that he could find nothing wrong.[15] Roadway's replacement driver then drove the tractor ten or fifteen miles and reported it safe to drive. When Ferguson then refused to drive the tractor "unless somebody from Roadway Express signs a statement that they will be responsible for the unit,"[16] he was discharged.

Pursuant to Articles 43 and 44 of the contract, Ferguson's grievance was heard by the Carolina Joint Bi-State Grievance Committee and denied on 11 April 1972. Four days earlier, Ferguson had filed a charge with the National Labor Relations Board alleging violation by Roadway of section 8(a)(1) of the National Labor Relations Act. The opinion of the trial examiner deferring to the Joint Committee award and dismissing the complaint was affirmed by the Board on 25 April 1973.

## II.

In *Spielberg* (post-arbitral) the Board established its policy of dismissing unfair labor practice complaints where the issues involved had been previously resolved by arbitral award. Under *Collyer* (pre-arbitral) the Board will withhold its processes until the parties first submit to those processes upon which they have privately agreed. If, after the Board has withheld under *Collyer,* the unfair labor practice issues are resolved by the arbitral tribunal, the Board will apply *Spielberg* and defer to the arbitral award.

In three opinions this year by Judges Wright and Tamm of this court, the *Spielberg* and *Collyer* doctrines are analyzed. Recognizing that

> submission to grievance and arbitration proceedings of disputes which might involve unfair labor practices would be substantially discouraged if the disputants thought the Board would give *de novo* consideration to the issue which the arbitrator might resolve[,] [17]

in Associated Press v. NLRB,[18] we approved the application of both *Spielberg* and *Collyer.* However, our acceptance of those doctrines was and is founded upon the premise that they are appropriately applied only where the resolution of the contractual issues is congruent with the resolution of the statutory unfair labor practice issues. In Local Union 2188 v. NLRB we held: "This congruence between the contractual dispute and the overlying unfair labor practice charge is significant. If it were not present, the Board's abstention might . . . constitute[ ] not deference,

---

13. Testifying before the trial examiner, Roy Potts (the second driver) stated: "Well, it scared me. I thought maybe it was going to break in two. . . . I didn't see how that I could drive the truck because I thought it was unsafe." Tr. at 97.

14. The mechanic testified that "I told him [Ferguson] that I wouldn't drive it, and that in my opinion the tractor was not safe to be on the road and get somebody else killed." Tr. at 182.

15. Claude Gatlin, Jr., Safety Investigator of the Department of Transportation, would state neither that the tractor was safe nor that it was unsafe. Gatlin merely inspected the vehicle and could find nothing visibly wrong with it.

16. Tr. at 333.

17. Associated Press v. NLRB, 160 U.S.App. D.C. 396, 401, 492 F.2d 662, 667 (1974).

18. *Ibid.*

but abdication." [19]   Moreover, shortly thereafter in Local Union 715 v. NLRB, we held that abstention is proper only where three prerequisites (established in the *Spielberg* opinion itself) are met: (1) fair and regular arbitral proceedings, (2) parties agreed to be bound by the arbitral award, and (3) a decision which is "not clearly repugnant to the purposes and policies of the National Labor Relations Act." [20]   To these we add other prerequisites exemplified in this case (*see* p. 347 *infra*).

### Banyard

■  As found by the trial examiner, the Company has engaged in the practice of requiring its employees to haul overloaded trucks in violation of state law.[21]   Banyard's attempts to protest the practice ultimately resulted in his discharge in 1969.[22]   We agree with the conclusion of the trial examiner:

> In the instant case, it is patent that the issue raised by the allegations of the complaint, namely, whether Ban-

yard has been discharged by Respondent because of his concerted or union activity, is not one which falls within the special competence of an arbitrator, but is primarily one for resolution under the provisions of the Act which the Board has been mandated by Congress to enforce.[23]

With respect to the issue whether the purpose of the Ohio law was for the protection of this driver, or other drivers on the highways, or for the protection of the highways, the Board majority refused to substitute its judgment for that of the Grievance Committee,[24] but pointed out that no points were assessed against the license of any driver caught hauling an overload,[25] and that during periods of suspension of a driver's license the Company agreed to provide employment at equivalent earnings.[26] Whatever the primary purpose of the Ohio law (which we need not determine), aside from possible loss of license *vel non*, there are other valid reasons for refusing to haul overloads in violation of

---

19. Local Union 2188, AFL–CIO v. NLRB, 161 U.S.App.D.C. 168, 172, 494 F.2d 1087, 1091 (1974).

20. Local Union 715, AFL–CIO v. NLRB, 161 U.S.App.D.C. 217, 219, 494 F.2d 1136, 1138 (1974).

21. In this connection, the record is amply supported by examples of employees who were told to pull overloads. One such employee was told to pull an overload and not get caught. App. 25–26.

22. That Banyard himself may have acquiesced in the practice by pulling overloads from 1966 to 1969 is not determinative of the issue now before us. He explained, and the trial examiner found, "that he pulled the overloads because he did not know the position of his union above the local level on overloads and that, without pulling overloads, he had to work 6 days a week in order to earn what other drivers earned in 5 days." App. 28.   Banyard, of course, had no more authority to sanction the Company's violation of the law than did the contract or the arbitral tribunal.

23. App. 30.

24. Referring to the arguments made by the dissent concerning the purpose of the Ohio state law, the Board majority stated

We are not persuaded that the issues are either as simple or dramatic as our colleagues assert, and are thus less anxious than they to rush to substitute our judgment for that of an experienced Committee, composed of experienced union and management representatives, or to accuse that Committee of sanctioning the creation of safety hazards.
App. 7.

25. The parties stipulated that under Ohio law no penalties would be assessed against a driver's license but that any overload was the obligation of the owner of the company. App. 27.

26. Article 36 of the contract provides in relevant part:
In the event an employee shall suffer a suspension or revocation of his chauffeur's license because of a succession of size and weight penalties, caused by the employee complying with his Employer's instructions to him, the Employer shall provide employment for such employee at not less than his regular earnings at the time of his suspension for the entire period thereof, subject however, to the seniority and lay-off provisions applicable to him at the time of such suspension.

state law. The trial examiner found definite safety risks involved in the practice.[27] These risks pose a danger not only to the driver himself, but to the rest of the motoring public as well.

Our review of the transcript fails to reveal that the Committee considered such important issues as safety. Moreover, the actual Committee award does not indicate that the Committee's judgment was exercised at all on the crucial issues regarding violation of the Ohio statute. The award to which the Board deferred states in its entirety:

> Please be advised that the National Grievance Committee on December 2, 1971, adopted a motion that based on the transcript, the claim of the Union be denied.

As Judge Tamm pointed out in *Local Union 715, supra,* "[T]his reasoning appears to contradict the Board's own decisions to the effect that deferral is not appropriate with respect to an issue not considered by the arbitration panel." [28] We do not know what *was* considered in the case at bar.

■ Regardless of the purpose of the Ohio statute, it remains axiomatic that it was still the law; for this or any other company to require its employees to act in violation thereof can never be upheld by the Board or this court. We concur in the dissenting Board members' perception of the dispositive issue in this case, *viz.,* "No contract provision or arbitration award can permit an employer to require his employees to violate state laws or to create safety hazards for themselves or others." [29] Left standing, the arbitral award below

grants the Company a license to violate state law and as such is void as against public policy and repugnant to the purposes of the National Labor Relations Act.

■ Congress recognized that neither employers, employees, nor labor organizations have "any right in [their] relations with each other to engage in acts or practices which jeopardize the public health, safety, or interest." [30] Whether Banyard's discharge was violative of section 8(a)(1) of the Act was the proper issue for the Board's consideration, and this in turn necessarily embraced the admitted violations of Ohio law and their repugnance to public policy and the purposes of the Act. To the three prerequisites of *Spielberg* already listed in *Local Union 715, supra,* we would add that the *Spielberg* doctrine only applies if the arbitral tribunal (A) clearly decided the issue on which it is later urged that the Board should give deference, and (B) the arbitral tribunal decided an issue within its competence. Here the doctrine was misapplied as to these two prerequisites. Moreover, the arbitral tribunal's award appears repugnant to the statute.

*Ferguson*

■ Section 7 of the Act extends to employees "the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection . . . ." [31] Ferguson contends that his refusal to drive was a protest against "abnormally dangerous" working conditions protected under section 502 [32] of the Act and a protest on

---

27. One employee testified that he had trouble maintaining traffic speed with an overload and that he could not brake an overload to a stop as he could a legal load. Both Banyard and another employee confirmed the difficult braking. Banyard also testified, and the trial examiner found, that overloading limits maneuverability. App. 26.

28. 161 U.S.App.D.C. at 220, 494 F.2d at 1139.

29. 202 NLRB No. 102 at 9, 82 L.R.R.M. at 1654 (Fanning and Jenkins, Members, dissenting).

30. 29 U.S.C. § 141.

31. 29 U.S.C. § 157.

32. 29 U.S.C. § 143. Section 502 provides in relevant part:
    [N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter.

behalf of other employees against the unsafe condition of the vehicle and to secure its repair. He argues that such protest constitutes protected activity under section 7. The Board argues that its deferral under *Spielberg* was proper because the statutory question—whether in all the circumstances Ferguson was justified in refusing to operate the tractor because of unsafe operating conditions—"was squarely faced by the Joint Committee since Article 16 of the contract prohibited discharging Ferguson unless his refusal to drive based on safety factors 'is unjustified.' "[33] Yet the Board's characterization of the contract and statutory issues as identical does not make them so, and our decisions make it clear that deferral on statutory issues is proper only where there is congruence with contractual issues.[34]

We perceive the resolution of the statutory issue here as dependent upon whether, in the Board's own language, "the actual working conditions shown to exist by competent evidence might in the circumstances reasonably be considered 'abnormally dangerous.' "[35] Rejecting the conclusion of the Third Circuit that "an employee's honest belief, no matter how unjustified, in the existence of 'abnormally dangerous conditions for work' necessarily invokes the protection of § 502," the Supreme Court in Gateway Coal Company v. United Mine Workers of America[36] recently held that "a union seeking to justify a contractually prohibited work stoppage under § 502 must present 'ascertainable, objective evidence supporting its conclusion that an abnor-

mally dangerous condition for work exists.' "[37]

Our reluctance in the case *sub judice* to sanction the Board's deferral to the Joint Committee award stems from our uncertainty over whether the standard applied by the Joint Committee to the *contractual* issue before it is the correct standard to be applied to the *statutory* issue before the Board. Our concern is that the Joint Committee applied a "safe-in-fact" standard and thereby found that Ferguson was not contractually justified in refusing to drive the tractor.[38] Under the more liberal *Gateway Coal* standard the Board might have concluded that Ferguson's belief that the tractor was unsafe was amply supported by "ascertainable, objective evidence."

Our approval of the Board's deferral under *Spielberg* of statutory issues to arbitral resolution along with contractual issues is conditioned upon the resolution by the arbitral tribunal of *congruent* statutory and contractual issues. In that situation "the arbitration award becomes the sole remedy for both contractual and statutory violations."[39] If in the present case the Joint Committee applied to the issue before it a standard correct under the contract but not under judicial interpretation of section 502, then it cannot be said that the statutory issue was decided by the Joint Committee. In that event the Board's abstention goes beyond deferral and approaches abdication.[40]

As in Banyard's case, the award of the Grievance Committee in this case

---

33. Respondent's Brief at 15.

34. *See* note 19 *supra* and accompanying text.

35. Redwing Carriers, Inc., 130 N.L.R.B. 1208, 1209 (1961).

36. 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

37. *Id.* at 386–387, 94 S.Ct. at 641.

38. The trial examiner found that the Joint Committee "in reaching its conclusion to deny the grievance had to conclude that Ferguson's refusal to drive the vehicle was unjustified. Possibly bolstering its conclusion is the fact that the tractor was driven some

800 miles without any repairs *after Ferguson's refusal.*" App. 12 (emphasis added). Evidence of what happened after Ferguson's refusal, while relevant to the question whether the truck was safe in fact, is irrelevant to whether there was "ascertainable, objective evidence" *supporting a justified conclusion* that an abnormally dangerous condition for work existed *at the time he refused to drive.*

39. 161 U.S.App.D.C. at 219, 494 F.2d at 1138.

40. *See* note 19 *supra* and accompanying text.

was exceedingly brief. After merely summarizing the Company's and the Union's positions, the award states in its entirety:

Claim of Union denied.

The trial examiner, whose findings were adopted by the Board in this case, stated that the "Committee in reaching its conclusion to deny the grievance had to conclude that Ferguson's refusal to drive the vehicle was unjustified."[41] Yet the failure of the Committee to amplify its decision forced the trial examiner to speculate by what standard the refusal was "unjustified." Neither the examiner, the Board, nor we are entitled to engage in such speculation.

Accordingly, these petitions are remanded with instructions that deferral not being appropriate, the Board should proceed to a consideration of the unfair labor practice issues in a manner not inconsistent with this opinion.

So ordered.

MacKINNON, Circuit Judge (concurring):

I concur in the majority opinion with respect to Ferguson and concur in the result with respect to Banyard.

As to Banyard, the majority errs in adopting an interpretation of the contract which conflicts with the interpretation by the National Grievance Committee. Banyard's position is that his refusal to drive the overloaded vehicle was an attempt to enforce Article 16 of the contract, which provides:

The Employer shall not require employees to take out on the streets or highways any vehicle that is not in safe operating condition or equipped with the safety appliances prescribed by law. . . . Under no circumstances will an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to person or property or *in violation of any applicable stat-* *ute or court order, or in violation of a government regulation relating to safety of person or equipment. . . . The Employer shall not ask or require any employee to take out equipment that has been reported by any other employee as being in an unsafe operating condition until same has been approved as being safe by the mechanical department. . . . The Employer and the Union together shall create a joint committee of qualified representatives for the purpose of consulting among themselves and with appropriate Government agencies, state and federal, on matters involving highway and equipment safety.* (Emphasis added.)

Banyard contends that the reference in the contract to "any applicable statute" is not limited to statutes "relating to safety" because the latter phrase is separated from the former by a comma. The majority opinion seems to adopt this construction of the contract.

The National Grievance Committee, however, adopted a contrary interpretation of the contract. In denying Banyard's grievance, the Committee necessarily concluded: (1) that the contractual reference to "any applicable statute" is limited to statutes "relating to safety," and (2) that the Ohio load-limit statute does not relate to safety. See Page's Ohio Rev.Code Anno. Ch. 5577 (1970). The Committee settled the interpretation of the contract for the parties and we are not at liberty to adopt a different interpretation. Since Article 16 is devoted entirely to employee and equipment safety, the Committee was on solid ground in concluding that the isolated phrase "applicable statute" refers only to statutes related to safety. This interpretation of the contract is not repugnant to the federal labor relations policy because Congress has not designated the National Labor Relations Board to be the enforcement agency for the multitude of state and local highway ordinances and other state laws.

41. App. 12.

The Grievance Committee was also on solid ground in concluding that the Ohio load-limit statute does not relate to safety. The purpose of that statute is to protect and to reduce maintenance costs of "improved streets, highways, bridges or culverts" in Ohio. See *id.* Most states have similar statutes designed to protect the highways, but the load limits vary from state to state. The limits also vary with the season of the year and the structure of the highway. Requiring an employee to operate a vehicle with loads in excess of a statutory load limit does not violate Article 16 of the contract, as interpreted by the Grievance Committee, absent some showing that the loads exceed the limit set by the manufacturer for the vehicle.

However, even accepting the Grievance Committee's interpretation of the contract and the statute, the Board erred in assuming that the Grievance Committee decision resolved the federal statutory issue. The National Labor Relations Act protects employees engaged in concerted activity designed to enforce contractual rights. 29 U.S.C. §§ 157, 158(a)(1) (1970). Even though Banyard's position with respect to the ambiguous language of Article 16 ultimately proved erroneous, his position was not unreasonable. In view of the grammatical structure of the relevant sentence in Article 16, a layman reasonably could conclude that the reference to "any applicable statute" was not modified by the subsequent phrase "relating to safety." As long as Banyard acted with a reasonable and good faith belief that his interpretation of the contract was correct, the National Labor Relations Act protects his concerted efforts to enforce that interpretation. Otherwise, employees would be discouraged from asserting interpretations favorable to themselves except in the clearest situations involving unambiguous contract language. In other words, the employee is protected when he engages in concerted activity to enforce a reasonable and good faith interpretation of the contract, even though his interpretation ultimately does not prevail.

For this reason, the Grievance Committee's adverse ruling on the contract interpretation issue did not foreclose a favorable ruling by the Board on the statutory claim under the National Labor Relations Act. Therefore, I would remand for the Board to determine whether Banyard's refusal to drive the overloaded truck was a concerted effort to enforce a reasonable and good faith interpretation of his contract.