COTTON'S, INC.

v.

TEAMSTERS LOCAL NO. 5.

Civ. A. No. 81–486–B.

United States District Court, M. D. Louisiana.

Sept. 29, 1982.

Walter W. Christy, Kullman, Lang, Inman & Bee, New Orleans, La., for plaintiff.

Lawrence R. Anderson, Jr., Anderson, Anderson, Steffes & Hawsey, Baton Rouge, La., for defendant.

POLOZOLA, District Judge:

This matter is before the Court on the motion of the plaintiff, Cotton's, Inc. for summary judgment. Cotton's seeks to have vacated an arbitrator's award rendered in connection with a labor dispute between Cotton's and the defendant, Teamsters Local No. 5. Cotton's contends that the award should be overturned because it did not draw its essence from the collective bargaining agreement between the parties. Cotton's further contends that the collective bargaining agreement as interpreted by the arbitrator is unenforceable under 29 U.S.C. § 158(b)(6). Oral argument is not required on this motion.

Cotton's has attached as Exhibit B to its motion the decision rendered by the arbitrator, F. Jay Taylor. The decision rendered by the arbitrator contains the following factual background which is undisputed by the parties:

> The basic facts of this case are not in dispute. The Company (Cotton's, Inc.), at its Baton Rouge bakery produces bread and other products under its brand name "Holsum," "Country Hearth," etc. It also bakes and distributes "private label" products to various stores and supermarket chains in an area including various parts of Louisiana and Mississippi which also fall within the territorial jurisdiction of Teamsters Local Union No. 5.

> For many years the Company has provided the Winn-Dixie food stores with its private label bread, "Velva." The driver-salesmen and transport drivers have been represented by the Teamsters since 1954 while the in-plant personnel (not a party to this dispute) are represented by the United Steelworkers Union. Up until June 24, 1981, the driver-salesmen delivered and racked Winn-Dixie private label bread (Velva) at the Company's various stores for which they were paid a commission similar to that paid for the delivery and racking of Cotton's brand label Holsum bread.

> In June, 1981, however, the Winn-Dixie Company decided that its bread delivery system would be handled in a different manner. The contract with Cotton's was terminated and Winn-Dixie called for competitive bids whereby all private label Velva bread would be delivered to the Winn-Dixie warehouse in New Orleans. Winn-Dixie personnel, in turn, would then deliver and merchandise the bread in the various Company stores. Cotton's successfully bid on the new contract and on June 25, 1981, began drop delivery shipment of bread to the Winn-Dixie New Orleans warehouse. The Company has contended that its bid included no commission for its driver-salesmen since these Employees provided no services connected with the delivery and sale of Velva bread. Nor, the Company argued, were such commissions mandated by the Contract.

> The Union disagreed, however, and a grievance was filed on June 17, 1981, wherein the Teamsters stated that:

> > "On June 9, 1981 you and Mr. Gene Cotton informed the union stewards that commencing June 25, 1981 that all Winn Dixie private label products will be specifically delivered by Cotton's, Inc. van drivers to the Winn Dixie warehouse in New Orleans, that these special deliveries in turn, will be distributed back to Winn Dixie stores within the jurisdiction of Teamsters Local No. 5 by special deliveries, and that no salesmen employed by Cotton's, Inc. will be paid any commissions for these special deliveries. This is a direct violation of Article XXVV (22) page 9 titled 'Special Deliveries,' of the current labor contract between Cotton's, Inc. and Teamsters Local No. 5.

"By means of this grievance we ask that the salesmen involved be made whole for any monies due them through their commissions that are outlined in the current collective bargaining agreement.

"Also, if this grievance is heard through arbitration or a court or other judicial proceeding, that Teamsters Local No. 5 and all affected employees be awarded appropriate compensatory and punitive damages, interest, attorney's fees and court costs allowed by the contract and/or applicable law, because the union considers this a bad faith and intentional breach of the contract." (Joint Exhibit 2A)

And on June 25, 1981, this grievance was amended and supplemented as follows:

"Teamsters Local No. 5 hereby supplements and amends it grievance dated June 17, 1981 by reiterating the aforementioned grievance as though copied at length and by adding the following matters. On June 9, 1981 you and Mr. Gene Cotton at the meeting with the union stewards of Cotton's, Inc. further indicated that because of the new policy of special deliveries to Winn-Dixie without payment of commissions to salesmen, a substantial number of routes would be cut or discontinued and a substantial number of route salesmen would be laid off as a result thereof. You and Mr. Cotton also indicated that the aforementioned action would be taken without the mutual consent of the union. This (is) a direct violation of Article XXVI, Page 11, entitled 'Route Cuts,' of the current labor contract between Cotton's, Inc. and Teamsters Local No. 5.

"By means of this supplemental and amending grievance, Teamsters Local No. 5 asks that no routes be cut or discontinued or any salesmen laid off as a result thereof, unless it is done with the mutual consent of the union and in accordance with Article XXVI of the contract."

(Joint Exhibit 2B)

It should also be noted that on June 25, 1981, the first day that the new drop delivery (New Orleans) system went into effect, the driver-salesmen initiated a work-stoppage to protest the new plan which, they contended, deprived them of commissions previously paid and mandated by the Contract. On the same date the Company obtained a temporary restraining order from the United States District Court directing the men to return to their jobs. On July 6, 1981, the Court issued a Preliminary Injunction wherein the "Teamsters Local No. 5, its members, agents, and representatives and all those acting in concert with or under its direction, inducement, persuasion or control, be and they are hereby enjoined, restrained and prohibited from engaging in any work stoppage or picketing and resulting work stoppage at or near Plaintiff's facilities or the facilities of Plaintiff's customers involving or connected in any way with a dispute, disagreement or grievance which is arbitrable under the collective bargaining agreement between the Plaintiff and the Defendant, or inducing or causing the employees of the Plaintiff to engage in such conduct, in breach of the collective bargaining agreement between the Plaintiff and Defendant herein.

"IT IS FURTHER ORDERED that Cotton's, Inc. and Teamsters Local No. 5 be and each is hereby ordered to arbitrate the grievance filed by the Union on June 17, 1981, as supplemented and amended on June 25, 1981."

The proceedings of this Arbitration, therefore, have been held pursuant to the order of the Court and without progression through the various steps of the grievance procedure as prescribed in the Collective Bargaining Agreement.

As viewed by the arbitrator "this case really turns on the intent and meaning of Article XXII, Paragraph A..." of the contract. (Arbitration Award, p. 15) The provision referred to states that all "merchandise delivered by any special deliveryman or picked up at the bakery by customers shall

be credited to the salesman on whose route the merchandise is sold." As noted by the arbitrator, Paragraph D of the Article says "[t]his Article shall apply to the present territorial jurisdiction of the Union." (Award p. 16) The arbitrator determined that this language compelled him to resolve the dispute in favor of the Teamsters.

After receiving the arbitrator's decision, Cotton's requested leave to amend its complaint to ask that the award be set aside. The Teamsters have counterclaimed for enforcement of the arbitrator's award, for monies allegedly owed to their members under the contract, for damages, and for attorney's fees. Arguing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, Cotton's now moves for summary judgment. For reasons which follow, the Court finds that Cotton's motion for summary judgment should be denied.

■■■ It is settled that the Court may not review the merits of an arbitration award. *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). The arbitrator's award is binding on the Court so long as it "draws its essence from the collective bargaining agreement." 363 U.S. at 597, 80 S.Ct. at 1361. Furthermore, the Fifth Circuit has stated that "the 'essence' standard is to be interpreted expansively so as to uphold the award." *International Ass'n. of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1121 (5 Cir. 1976). Thus, courts in this circuit do not review the factual or legal accuracy of the arbitrer's findings. Id. 538 F.2d at 1121.

■ Following the above guidelines, the Court finds that the arbitrator's award in this case may not be set aside. A review of the arbitrator's findings clearly reveals that his decision was based upon his construction of the collective bargaining agreement. The arbitrator concluded that the meaning of the terms of the contract was clear and that he found them to be determinative. (Award, p. 15). He noted that Article XXII, Paragraph A referred to "all merchandise delivered by any special delivery-

man". The underlying rationale of the award was that these words did not limit the merchandise on which Cotton was to pay a commission to its salesmen. Thus, the arbitrator reasoned that even if the bread was ultimately delivered by Winn-Dixie employees to Winn-Dixie stores on the route of a Cotton's salesman, the commission would still be owed to the Cotton's salesman. (Award, pp. 16–17).

Cotton's argues that the award should be vacated because it is not rationally inferable from the terms of the agreement or the evidence in the record. Cotton's contends that: (1) the arbitrator's construction of the term "special delivery" allegedly is inconsistent with the evidence presented during arbitration; (2) the conclusion that the bread is now delivered by "special delivery-men" is inconsistent with the contract and the arbitrator's findings of fact; (3) the arbitration record does not support the conclusion that the bread is going to "customers located on the route served by salesmen"; (4) inferences drawn from prior dealings between the parties are said to be illogical; and, (5) the arbitrator relied upon the legal opinion of an attorney which was rendered to a client which was a competitor of Cotton's.

With the exception of contention number 5, all of the objections raised by Cotton's to the arbitrator's award go to the merits of the arbitrator's construction of the contract. None presents a sufficient basis on which to vacate the award. Even if this Court might have found that the testimony which the arbitrator heard supported a different construction of the terms of the contract, this Court may not "review the merits or the factual and legal accuracy of the arbiter's findings." *Texas Steel Co.*, supra, at p. 1121. The arbitrator here confined his role "to interpretation and application of the collective bargaining agreement;" he did not "dispense his own brand of industrial justice." *Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361. The Court cannot say that the arbitrator's decision may not "in some logical way, be derived from the wording or purpose of the

contract." *Brotherhood of Railroad Trainmen v. Central of Georgia Railway Co.,* 415 F.2d 403, 412 (5 Cir. 1969). Because the result reached by the arbitrator may be rationally drawn from the contract itself, the Court may not rely upon testimony as to past practices and negotiations of the parties in order to reverse the arbitrator's decision on the merits.

■ The Court also finds that the arbitrator did not err in considering the legal opinion and testimony of Mr. Gordon Pugh in determining the intent of the parties to the contract including the disputed language which was the subject of the arbitration. Mr. Pugh, who represented Wolf Baking Company (Wolf) participated in joint negotiations between Cotton's, Wolf and the Teamsters which led to the collective bargaining agreements between those parties and which contained the disputed language. It is clear that Mr. Pugh would have insight and personal knowledge as to the intentions of the parties. (Award, p. 18) In *Enterprise Wheel,* supra, 363 U.S. at 598, 80 S.Ct. at 1361, the Supreme Court stated:

> A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

■ Cotton's also asserts that even if the arbitrator did not exceed his authority in construing the contract, the agreement is unenforceable because it conflicts with Section 8(b)(6) of the National Labor Relations Act, 29 U.S.C. § 158(b)(6), as amended by the Labor Management Relations Act (1947) or the Taft-Hartley Act. That provision makes it an unfair labor practice for a labor organization or its agents:

> (6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an extraction, for services which are not performed or not to be performed;

■ Cotton's argues that under § 8(b)(6) the collective bargaining agreement, as construed by the arbitrator, is illegal and violates a federal policy against "featherbedding". This argument is without merit. "Featherbedding is a method of creating or spreading employment by unnecessarily maintaining or increasing the number of employees or the time used to complete a particular job." Note, Featherbedding and Taft-*Hartley,* 52 Col.L.Rev. 1020–1033 (1952). Although the elimination of featherbedding may have been attractive to Congress, the legislative history of the Taft-Hartley Act "demonstrates that when the legislation was put in final form Congress decided to limit the practice but little by law." *American Newspaper Publishers Ass'n. v. NLRB,* 345 U.S. 100, 106, 73 S.Ct. 552, 555, 97 L.Ed. 852 (1953). The statute does not purport to affect the validity of labor contracts which have been voluntarily entered into by the parties after arms-length negotiation which might arguably include featherbedding provisions. Nor do the terms "cause or attempt to cause" include the presentation by a union of a bargaining demand for a featherbedding provisions which would constitute unfair labor practice. The invalidity of a contract resulting from such a demand, therefore, may not be inferred from the statute.

■ Cotton's cites *Kaiser Steel Corp. v. Mullins,* —— U.S. ——, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) in support of its argument that the contract is unenforceable. That case is not applicable under the facts of this case. In *Mullins,* a union sued a coal producer on its contractual promise to contribute to union welfare funds based on its purchases of coal from producers not under contract with the union. The Supreme Court allowed the producer to plead the defense that the promise was an illegal hot cargo agreement under §§ 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1 and 2,[1] and § 8(e) of the LMRA, 29 U.S.C. § 158(e).[2] However, unlike § 8(b)(6), § 8(e) of the LMRA specifically forbade contracts between a union and an employer to perform the proscribed conduct,—i.e., to cease doing business with or handling the products of another employer. The statute makes it an unfair labor practice to even enter into such a contract and expressly declares such a pact to be unforceable and void. Contracts falling within the cited anti-trust provisions were also expressly banned and subjected the parties to criminal prosecution. Here, the statute does not forbid the employer from voluntarily agreeing to a featherbedding clause in a labor contract. Nor does the statute address the validity of such an agreement. While courts will refuse to enforce a contract or arbitration award that requires a violation of the law, *Johns-Manville Sales v. Intern. Ass'n. of Machinists,* 621 F.2d 756, 758–759 (5 Cir. 1980), such is not the case here. Enforcement of the contract and arbitration award in this case does not call for Cotton's to commit an unfair labor practice, *Glendale Mft. Co. v. Local 520, International Ladies' Garment Workers' Union,* 283 F.2d 936, 939–40 (4 Cir. 1960) cert. denied, 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961), or to otherwise violate positive law, *Baynard v. NLRB,* 505 F.2d 342, 347 (D.C.Cir.1974). Also, § .8(b)(6) did not enact a broad national policy prohibiting all instances of featherbedding.

Not only does the contract here neither compel illegal action by the parties nor contain terms which are *per se* prohibited and enforceable, but the present record does not indicate that they were secured by way of unfair labor practices on the part of the Teamsters. It does not appear that Article XXII of the contract resulted from any greater confrontation than the submission of a bargaining demand that was voluntarily agreed to by Cotton's. Such activity by the union does not come within the prohibition set forth in the statute.

§ 8(b)(6) makes it an unfair labor practice for a union "to cause or attempt to cause" an employer to pay for work which is not done, when such activity is "in the nature of an exaction". Little litigation has transpired concerning the meaning of these terms, but the legislative history of the Taft-Hartley Act shows that they do not include a simple bargaining demand. § 8(b)(6) prohibits demands which amount to "exactions". In his supplementing analysis of § 8(b)(6) found at 93 Cong.Rec. 6859 (1947), Senator Taft stated that "[t]he use of the terms 'in the nature of an exaction' make it quite clear that what is prohibited is extortion by labor organizations or their agents in lieu of providing services which an employer does not want". There is no evidence in the record that Cotton's agreement to Article XXII was extorted by the Teamsters. The present record does not even reflect that this provision was included in the contract at the Teamsters' request.

---

1. Sections 1 and 2 of the Sherman Act provided at the time of the *Kaiser* agreement in part:

   § 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...

   § 2. Monopolizing trade a misdemeanor; penalty

   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on con-

viction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

2. § 8(e) provides in part:

   It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void.

The Court's research has revealed no reported cases which have survived appellate review where a federal court found a union guilty of an unfair labor practice under § 8(b)(6). On the other hand, the decision in *Gremio de Prensa, Etc. v. Voice of Puerto Rico, Inc.,* 121 F.Supp. 63 (D.Puerto Rico, 1954) shows that Cotton's has not demonstrated that the Teamsters "caused or attempted to cause" payments as contemplated by § 8(b)(6). In *Prensa* a union sued an employer to enforce an agreement under § 301, Title III, of the LMRA (1947), 29 U.S.C. § 185. The employer moved to dismiss the complaint, contending that § 8(b)(6) precluded the court from exercising jurisdiction because the agreement might constitute an unfair labor practice and, thus, be illegal. The court denied the motion because:

> The complaint, ... does not contain any allegation, nor the least intimation that the agreement on which plaintiff is suing may have been entered into by defendant on account of any exaction" from plaintiff or that defendant may have been in any way compelled to execute the same by force, threats or any other involuntary means. What flows from the complaint, in this respect, is just the opposite, i.e. that said agreement was entered into by defendant freely and voluntarily ...

> Whether defendant can allege by responsive pleadings hereafter filed, and subsequently establish at the trial, that it was coerced, compelled or constrained by some involuntary means to enter into the agreement in question and further convince the court that by virtue thereof it is entitled to successfully invoke either the Lea Act, Title 47 U.S.C.A. § 506, or the provisions of Section 8(b)(6) of The Labor Management Relations Act, Title 29 U.S. C.A. § 158(b)(6), still remains an open question to be determined by the court in its final decision on the merits.

There have been few decisions from the National Labor Relations Board applying § 8(b)(6). The few decisions which have been rendered support the Court's decision to deny Cotton's motion. Cotton's cites two instances in which the Board found unions guilty of violating § 8(b)(6). However, neither is contrary to the result reached here. In *Metallic Lathers Union of New York (Expanded Metal Engineering Co.),* 207 NLRB 631 (1973), the union, which had no contractual relationship with the employer, unlawfully [3] attempted to incite secondary boycotts in order to pressure the employer into hiring one of its members for whom the employer had no use. In *Teamsters, Local 456 (J. R. Stephenson Corp.),* 212 NLRB 968 (1974) an employer refused to agree to a new contract with a union to replace an expiring agreement requiring it to employ a union member which the employer neither wanted nor needed. The union responded with coercive measures. The NLRB concluded that "[r]espondent's demand for a new contract calling for payments for the presence of one of its members at the jobsite when no teamster work was being performed and where the Employer indicated it had no need for teamster labor, coupled with a strike to make the Employer respond to such a demand, is an exaction within the meaning of Section 8(b)(6)." It is necessary for the Court to compare this decision with the decision rendered by the Board in *International Typographical Union (American Newspaper Publishers Ass'n),* 86 N.L.R.B. 951 (1949) (Intermediate Report of the Trial Examiner) at pp. 1032–1033. Although the Board emphasized other grounds in affirming the Trial Examiner's absolution of the union under § 8(b)(6), the Board, at p. 951, stated that it adopted "the findings, conclusions, and recommendations of the Trial Examiner," subject to its own "additions, explications, and modifications." Nothing said by the Board indicated disapproval of the following observations of the Trial Examiner which this Court finds persuasive:

> I am persuaded from a reading of the statute and its history that Congress intended proof of something more than an insistent demand in collective bargaining

---

**3.** 29 U.S.C. § 158(b)(4)(i) and (ii)(B).

when it proscribed an 'attempt to cause an employer to pay . . . in the nature of an exaction . . . for services . . . not performed.' The House bill, from which Section 8(b)(6) was derived, proscribed only union activities in the form of a 'strike or other concerted inference with an employer's operations.' Although the Conference bill substituted for these words 'cause or attempt to cause,' it also added the words, 'in the nature of an exaction.' The legislative history shows no disposition on the part of the Senate at least, to broaden the provisions of the House bill with respect to the prohibited form of activity. It discloses instead that what Congress was concerned with were practices in the nature of 'extortion.' Clearly, a demand made at a bargaining table cannot be deemed, 'extortion,' especially where that demand is for an item which has traditionally been regarded as part of the compensation to be paid to the employees in the unit as a group. To hold otherwise is to say that any demand in negotiations for an item which an employer or labor union does not want, but to which it accedes, however reluctantly, in order to reach a settlement on other issues, is 'in the nature of an exaction.'

The above observations are supported by an examination of Senator Taft's explanation of the action of the Conference Committee in reconciling the House version of the L.M.R.A. (1947), which greatly proscribed featherbedding, and the Senate bill, which ignored it. Senator Taft stated:

Section 8(b)(6) of the conference agreement covers a matter with which the House bill dealt extensively under the topic of featherbedding practices. There was no corresponding provision in the Senate amendment. The provisions in the House bill made unlawful and enjoinable any strike to compel an employer to accede to featherbedding practices. Among the activities defined as a featherbedding practice by the House bill were: (1) Agreeing to employ persons in excess of the number reasonably required, (b) paying money in lieu of employing such an excess number of persons, (c) paying more than once for services performed, (d) paying money for services not performed, and (e) paying a tax for the privilege of using certain articles or operating certain machines or agreeing to restrictions upon their use. While the Senate conferees were in sympathy with the objectives of this portion of the House bill, it seemed to them that it was almost impossible for courts to determine the exact number of men required in hundreds of industries and all kinds of functions. The provisions in the Lea Act from which the House language was taken are now awaiting determination by the Supreme Court, partly because of the problem arising from the term 'in excess of the number of employees reasonably required.' Therefore, the conferees were of the opinion that general legislation on the subject of featherbedding was not warranted at least until the joint study committee proposed by this bill could give full consideration to the matter. Since the matter of exacting money for services not to be performed borders definitely on extortion, the conferees agreed to the insertion of a paragraph (sec. 8(b)(6)) which makes it an unfair labor practice to cause or attempt to cause employers to pay money under such circumstances.

In summary, the Court finds that the federal labor laws do not forbid employers and unions from voluntarily agreeing to provisions such as Article XXII of the contract. The Court further finds that Article XXII does not require illegal action by Cotton's. The Court also concludes that based on the facts in the record it does not appear that agreement was coerced from Cotton's by way of unfair union labor practices. Therefore, the Court finds that the collective bargaining agreement and the arbitrator's award are not void. Because of the conclusion reached by the Court, it is unnecessary to consider whether Article XXII comes within the other elements of proscription of § 8(b)(6) which were not discussed. Finally, the Court finds that since the arbitrator acted as an interpreter of the

contract and based his award on the terms of the contract, the Court may not alter that award.

Therefore:

IT IS ORDERED that the motion of the plaintiff, Cotton's, Inc., be and hereby is DENIED.