EDGEWOOD NURSING CENTER, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Teamsters Local Union No. 800, Intervenor.

No. 77–2035.

United States Court of Appeals, Third Circuit.

Argued May 2, 1978.

Decided July 24, 1978.

Richard H. Martin, Joan P. Feldman, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for petitioner.

Edward Dorsey, N. L. R. B., Washington, D. C., Paul J. Spielberg, Ruth E. Peters, John S. Irving, John E. Higgins, Jr., Carl L. Taylor, Washington, D. C., for respondent.

Jonathan G. Axelrod, Hugh J. Beins, Bethesda, Md., for intervenor.

Before HUNTER and WEIS, Circuit Judges, and COHEN,* District Judge.

OPINION

JAMES HUNTER, III, Circuit Judge:

Edgewood Nursing Center, Inc., has petitioned for review of an order of the National Labor Relations Board. The Board has filed a cross-application for enforcement of the order. The Board found that Edgewood committed unfair labor practices by threatening to reduce the hours of employees to avoid their unionization and by discharging a licensed practical nurse because of her activities on behalf of the union. Edgewood has been ordered to cease and desist from these violations and to offer reinstatement with full back pay to the nurse. 230 N.L.R.B. No. 157 (1977). The petition questions whether there is substantial evidence in the record to support the Board's findings. While we find that the record supports the conclusion that the company threatened to reduce working hours, we do not find sufficient evidence that the discharge was motivated by anti-union animus. We therefore grant enforcement in part and deny enforcement in part.

I

Edgewood Nursing Center, Inc., operates a proprietary nursing home providing primarily geriatric care in Youngstown, Pennsylvania. The unfair labor practice charges involved in this appeal arose from the ultimately successful efforts of Teamsters Steel Haulers Local Union No. 800 to organize the Center's service and maintenance employees, including Licensed Practical Nurses (LPN's).

The first charge was that a supervising nurse at Edgewood made threats against two LPN's who were active in union activities. The Union began its organizational campaign in September, 1975. Dona Orlo, a staff LPN, initiated the drive and was the union's chief organizer. On October 20,

* Honorable Mitchell H. Cohen, Senior United States District Judge for the District of New Jersey, sitting by designation.

Edgewood was formally notified that Orlo was the chief in-plant organizer. The LPN distributed and solicited union authorization cards and signed campaign literature. During October, Orlo was assisted by another staff LPN, Sylvia Mekic. On October 21, 1975, the Union filed a petition with the Board for an election at Edgewood. The proposed bargaining unit would consist of service and maintenance employees, including LPN's but excluding Registered Nurses (RN's).

In late September 1975, Edgewood received a deficiency letter from the Pennsylvania Department of Public Welfare. In response to one criticism contained in the letter, the Center's Board of Directors voted to upgrade patient care by hiring additional RN's. A notice to this effect was posted on or about September 20 until October 26, 1975.

Sometime in October, Edgewood's Director of Nursing, Rita Immel, RN, had a conversation with Orlo. Immel explained that the Center had been designated a "skilled" nursing home and that "in the future this would require the hiring of more registered nurses, and [the LPN's] would be getting the leftovers as far as hours were concerned." A similar statement was made to Mekic. She was told that RN's would be running all nursing shifts rather than LPN's. Immel testified before the administrative law judge that she had told the two LPN's that "if they were interested in looking for other jobs [because of the staff change], they were free to do so, that as vacancies arose [Edgewood] would he hiring RN's." Edgewood's Administrator, J. Robert McKissick, testified that the purpose of Immel's conversation was to allay fears of LPN's that they would be replaced by RN's. The administrative law judge found that in fact the facility had always been classified as a skilled home, and that the Department of Public Welfare required the hiring of more licensed personnel, either LPN's or RN's, rather than only RN's. There was no testimony indicating that Immel spoke to other LPN's about the hiring of RN's.

The Board affirmed the administrative law judge's finding that the Center, through Immel, had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by threatening to reduce the working hours of LPN's and eventually to eliminate that job classification to avoid unionization of its employees. The Board particularly relied on the facts that the home had always been designated a skilled facility; that the conversations, which occurred shortly after the beginning of the organization effort, "were hardly reassuring to the Union's most active proponents;" and that no comments were made to other LPN's.

■ At the outset we note that the Board's factual findings bind this Court "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Where there are credibility determinations, they rest with the administrative law judge as long as he considers all relevant factors and sufficiently explains his resolutions. *N.L.R.B. v. W. C. McQuaide, Inc.*, 552 F.2d 519, 526 n.14 (3d Cir. 1977); *Altemose Construction Co. v. N.L.R.B.*, 514 F.2d 8, 16 (3d Cir. 1975).

■ An employer violates section 8(a)(1) of the Act when it threatens that economic reprisals may be a consequence of unionization. "[T]he possibility that a statement contains an implied threat must be judged from the employee's point of view." *Mon River Towing, Inc. v. N.L.R.B.*, 421 F.2d 1, 9 (3d Cir. 1969) (footnote omitted). *See N.L.R.B. v. Colonial Knitting Corp.*, 464 F.2d 949, 951 (3d Cir. 1972); *Carlisle Paper Box Co. v. N.L.R.B.*, 398 F.2d 1, 4–5 (3d Cir. 1968). We hold that there is substantial evidence in the record to support the Board's finding of a violation of section 8(a)(1). The Union was organizing a unit which would include LPN's but exclude RN's. Immel told only two LPN's, both of whom were actively organizing, that RN's would be assuming a greater part of the work of the nurses and would be taking preferred hours. Further, the two

were told that they were free to leave, and would be replaced by RN's. From these circumstances, the Board could reasonably conclude that the two nurses perceived this message as a threat of economic retaliation for union activity leveled against them and against the LPN's generally. Accordingly, we will not disturb the Board's finding of an unfair labor practice for threatening economic reprisal.

## II

The second unfair labor practice with which Edgewood was charged was terminating the employment of LPN Orlo. The General Counsel argued that the discharge was motivated by anti-union animus. Edgewood claimed that Orlo was discharged because she made her second error in dispensing medication, which resulted in an elderly patient's receiving double the prescribed dose of a drug.

Prior to June 1973, the Center's policy regarding medication errors was as follows. The employee involved was required to complete an incident report. After an investigation into the facts and an evaluation of the seriousness of the situation, the incident was discussed with the employee. The employee was reminded of the importance of such events and the possible consequences of such an error.

In March 1973 Orlo made a medication error. The patient was not harmed by the mistake. Orlo filed a report on the incident. The Director of Nursing, Immel, made a notation in Orlo's employment file which stated, "Mrs. Orlo spoken to re medication error. Very much aware of danger of medication errors." Orlo was not otherwise disciplined and was not warned that another error would result in discharge.

In June 1973 a patient died as the result of medication error by another LPN. This was the nurse's first mistake. The Center's Administrator, McKissick, investigated the incident and received reports from Immel and the home's Medical Director, Dr. John Blair. McKissick interviewed the nurse the day after the incident and indicated that she would have to resign or be discharged. The nurse resigned immediately.

As a result of that patient's death and the lawsuit which followed, Edgewood instituted a new policy with respect to medication errors. McKissick testified before the administrative law judge that the new policy was as follows:

Medication errors and/or overdoses could not be tolerated and could be grounds for immediate discharge. There would be a full investigation, that investigation would also include any recommendations or reports from the medical director, reports and recommendations from the Director of Nursing, any other reports from any supervisory personnel who may have been involved in the incident, the potential harm that could occur to the patient, seriousness of the incident, the reasons for a mistake and whether or not this was, in fact, the first such mistake on the part of the staff member.

The record does not clearly show the extent to which the new policy was communicated to the employees. The full statement was never reduced to writing. Immel testified that she held a meeting on November 5, 1973 and told the staff that serious medication errors could result in discharge and that immediate discharge would result after a second error. The LPN's who testified did not recall this meeting nor being told of the new policy. The administrative law judge made no credibility finding on this issue. Immel's notes of the meeting were posted, and stated, "Serious medication errors will not be tolerated and can result in discharge."

In June 1974, after the new policy went into effect, an LPN accidentally gave a patient sleeping pills prescribed for another patient. The patient was not harmed. The nurse involved discussed the matter over the phone with Immel and testified that Immel may have verbally reprimanded her. The record contains evidence of two other nurses who made their first medication error. The first incident occurred sometime either in 1971 or 1973. The patient did not suffer any lasting effects, and Immel spoke with the nurse involved but did not warn or

formally reprimand her. The second occurred in September 1973. The Board was uncertain whether the new policy was formulated at that time and noted that the attempt to communicate the policy to the staff occurred later. In that case the nurse gave a patient an overdose of insulin. The patient went into insulin shock but recovered without harm. The nurse was not warned or otherwise disciplined. She resigned in October, by her testimony, partly because of the incident and partly because of personal reasons.

On March 9, 1976, Orlo committed her second medication error. That evening an elderly patient was supposed to receive 25 mg. of Thorazine, a tranquilizing drug, and 400 mg. of meprobamate, a sedative. Orlo correctly administered the Thorazine, but erroneously gave the patient 800 mg. of the sedative. The 800 mg. dose had been prescribed for a patient on another floor of the nursing home.

Orlo immediately realized the error and reported to the supervising RN, Dorothy Caravaggio. Caravaggio directed Orlo to call the patient's attending physician. Orlo by mistake first called Dr. Blair, Edgewood's Medical Director. She told him only of the overdose of meprobamate and did not mention that the patient was also receiving Thorazine. Dr. Blair told Orlo to look up the maladministered drug in a reference book while he did the same. He indicated that he would call back. Realizing that she had called the wrong doctor, Orlo then called Dr. Joseph Doherty, the patient's attending physician. Again, Orlo mentioned only the sedative; Dr. Doherty testified that he had no recollection at that time that he had also prescribed Thorazine for the patient. Dr. Doherty told Orlo that she was not to worry, as the additional sedative would not harm the patient. The patient's health remained stable and in fact no harm came to him as a result of the error. Orlo filled out an incident report as required by the Center's policy. Both the Administrator, McKissick, and the Director of Nursing, Immel, were told of the incident that night.

The next day, McKissick requested reports on the incident in accordance with the June 1973 policy. Dr. Blair that morning had discovered that the patient had also received Thorazine in addition to the overdose of meprobamate, and testified that he considered the combination of the two drugs to be potentially dangerous. His report recommended that Orlo be discharged. Immel also recommended discharge, noting the seriousness of the incident and the possible harm to the patient. She also erroneously stated that the only previous similar incident had resulted in the immediate discharge of the nurse involved. Caravaggio filed a report but made no recommendation. Dr. Doherty was not contacted regarding the nurse. McKissick decided to discharge Orlo. He testified that his decision was based on the recommendations of Dr. Blair and Immel, the potential harm to the patient, and the fact that this was Orlo's second medication error. Orlo was not given an interview with McKissick, nor was she allowed to resign before the notification of discharge was delivered to her.

The Board, with one dissenting vote, agreed with the administrative law judge that Edgewood had violated sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3), by discharging Orlo. The majority pointed to background evidence which showed hostility directed against Orlo in 1975 because of her union activity. The company's campaign against the union and its ultimately unsuccessful objection to the election contained specific references to Orlo's activities. Further, the Board relied on the evidence which supports the finding of a violation of section 8(a)(1), that a threat of economic retaliation was directed at Orlo and another nurse in October 1975. The Board next examined the reason given by the Center for discharging the nurse. The majority ruled that the medication error was merely a "pretext" for the action, while the real motive was anti-union animus. The dissent disagreed with the majority's interpretation of the evidence and concluded that the discharge was motivated by Edgewood's concern for the health and welfare of its patients and thus was not an unfair labor practice.

 Whether the employer's discharge of an employee violates section 8(a)(1) and 8(a)(3) of the Act depends on the employer's motive. *N.L.R.B. v. Brown,* 380 U.S. 278, 283, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *N.L.R.B. v. Eagle Material Handling, Inc.,* 558 F.2d 160, 169 (3d Cir. 1977). Despite the concurrent existence of a justifiable cause for discharge, the employer violates the act if anti-union animus was the "real motive," *N.L.R.B. v. Brown, supra,* 380 U.S. at 287, 85 S.Ct. 980; *N.L.R.B. v. Gentithes,* 463 F.2d 557, 560 (3d Cir. 1972), or the "real cause," *N.L.R.B. v. Rubber Rolls, Inc.,* 388 F.2d 71, 74 (3d Cir. 1967). *See N.L.R.B. v. Buitoni Foods Corp.,* 298 F.2d 169 (3d Cir. 1962). If two or more motives are behind a discharge, the action is an unfair labor practice if it is partly motivated by reaction to the employee's protected activity. *N.L.R.B. v. Eagle Material Handling, Inc., supra,* 558 F.2d at 169; *N.L.R.B. v. Princeton Inn Co.,* 424 F.2d 264 (3d Cir. 1970). On the other hand, if the employee would have been fired for cause irrespective of the employer's attitude toward the union, the real reason for the discharge is nondiscriminatory. In that circumstance there is no causal connection of any anti-union bias and the loss of the job. *N.L.R.B. v. Princeton Inn, supra,* 424 F.2d at 265; *Neptune Water Meter Co. v. N.L.R.B.,* 551 F.2d 568 (4th Cir. 1977); *Mueller Brass Co. v. N.L.R.B.,* 544 F.2d 815 (5th Cir. 1977); *N.L.R.B. v. Park Edge Sheridan Meats, Inc.,* 341 F.2d 725 (2d Cir. 1965). Thus, if the employer puts forward a justifiable cause for discharge of the employee, the Board must find that the reason was a pretext, and that anti-union sentiment played a part in the decision to terminate the employee's job. *Hugh H. Wilson Corp. v. N.L.R.B.,* 414 F.2d 1345, 1353 & nn.17, 18 (3d Cir. 1969), *cert. denied,* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970); *N.L.R.B. v. Rubber Rolls, Inc., supra,* 388 F.2d at 74. *See N.L.R.B. v. Armcor Industries, Inc.,* 535 F.2d 239, 243 (3d Cir. 1976); *N.L.R.B. v. G. & J. Co.,* 346 F.2d 960 (3d Cir. 1965).

Our review of the record as a whole and approach used by the Board's majority leads us to the conclusion that the Board's finding of an unfair labor practice arising from Orlo's discharge cannot be sustained. Initially, we note that the record does support the Board's finding that Edgewood had expressed anti-union sentiment toward Orlo at least in late 1975. The evidence of the threat of economic retaliation against Orlo and of the references to her during the employer's anti-union campaign support this general inference. There is no direct evidence, however, that this attitude influenced the decision in June 1976 to fire the nurse. The Board's finding of anti-union motivation is based on the general animosity directed against the nurse and on the circumstance that Edgewood's objections to the union's November 15, 1975 certification election were still pending before the Board at the time of the discharge. Were it not for the assertion on the facts of this case of a legitimate reason for firing the nurse, this evidence might support a finding that the action violated the Act. *See, e. g., N.L.R.B. v. Eagle Material Handling, Inc., supra,* 558 F.2d at 169–70; *N.L.R.B. v. Electric City Dyeing Co.,* 178 F.2d 980, 982 (3d Cir. 1950).

 In this case, however, the record makes clear that the discharge was occasioned by Orlo's second medication error. Once a legitimate reason for discharge is indicated, we must determine whether there is substantial evidence to support the Board's conclusion that the reason was merely a pretext for the discharge. We do not find such evidence in the record of this case, and believe that the only reasonable inference is that the second medication error was the sole reason for the Center's action.

Under Edgewood's policy which was promulgated in 1973, medication errors could be grounds for discharge. The decision would be made after an investigation consisting of reports and recommendations from the Medical Director and the Director of Nursing, and reports from other supervisory personnel involved in the incident. Factors to be considered would include the seriousness of the incident, the potential and actual harm to the patient, the reasons for the mistake, and whether the mistake

was the first by the nurse. The Board did not question that this formulation was in fact the Center's policy.

The first basis for the Board majority's finding of a pretext is that the existing policy should not have been applied to Orlo's error. The Board noted that it was "unclear" whether the policy had been adequately communicated to the staff. The Board pointed out the disparity between the policy as described in McKissick's testimony and in the summary statement contained in Immel's posted notice. The majority next noted that three years had passed between Orlo's first and second errors. It then reasoned, "While we do not condone errors of this nature, we are constrained to say that employees are entitled to be made aware of such policies, and of changes in them, before they can be held to the level of performance required by such policies." The dissenting Board member argued that even if the nurses were not fully informed of the new policy regarding medication errors, the nursing home "had a right to insist on a high standard of performance from its nursing personnel as long as [its] policies were not discriminatorily applied."

There is no evidence in the record to indicate that the length of time between medication mistakes would in some way mitigate the applicability of the policy to a second error. No other nurse had committed two errors. The inference that the policy might not call for discharge when two errors were separated by a few years is at best speculative.

 Further, we believe that the Board impermissibly concluded that a nurse could not be held to the "level of performance" required by the medication error policy. There is no evidence on this point in the record. In some contexts this inference might nevertheless be reasonable. For example, if a production worker were fired for not increasing his output by the terms of an undisclosed new policy, it might be a fair conclusion that the worker could not be held to that new policy and that the policy was merely a pretext for discharge. On the other hand, when dealing with potential

dangers to human life, it is clear that employees must be required to meet high standards of care. As the Board itself noted, work of licensed and professional employees of a hospital involves "high standards of care and concern," and the issue involved in this case is "one in which life or death may hang in the balance." This distinction between medical care facilities and other labor-management settings was recently noted by the Supreme Court in *Beth Israel Hospital v. NLRB,* —— U.S. ——, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978) (quoting from court of appeals opinion):

> "the Board [bears] a heavy continuing responsibility to review its policies concerning organizational activities in various parts of hospitals. Hospitals carry on a public function of the utmost seriousness and importance. They give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar. The Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized." [*N.L.R.B. v. Beth Israel Hospital,* 554 F.2d 477, 481 (1st Cir. 1977)]

*See also St. Vincent's Hospital v. N.L.R.B.,* 567 F.2d 588 (3d Cir. 1977). Irrespective of the extent to which the policy was communicated to the nurses, they could be held to a high standard of performance, which included making no medication errors. In this respect we agree with the observations of the dissenting Board member Walther.

Given that the policy could be applied to Orlo, we must examine its effect. Since Orlo was the only nurse who made two medication errors, there are no closely analogous incidents with which to compare her discharge. After a first nonserious error, nurses were at most reprimanded. Only one error other than Orlo's was found definitely to have occurred under the new policy. The administrative law judge made no finding as to whether that nurse was given a warning. Edgewood contended that she had, and the nurse testified that she may have been reprimanded. The only discharge other than Orlo's occurred after a

nurse's first error caused a patient's death. That nurse was asked to resign the day after the incident. The Board made no finding of what would be the usual discipline after a second error. McKissick testified that the appropriate discipline would be affected by whether or not the nurse had made other errors. No evidence contradicts this statement, and the Board did not discredit McKissick's testimony.

Applying the medication error policy by its terms to the Orlo incident, we believe that the only reasonable conclusion based on the record as a whole was that Orlo would have been discharged or forced to resign as a result of her error. Edgewood's Administrator, McKissick, collected reports and recommendations from precisely the persons specified in the Center's policy, the Medical Director and the Director of Nursing, and obtained a report from the supervising RN who was indirectly involved in the incident. All the recommendations indicated that Orlo should be discharged. The Medical Director, Dr. Blair, reported that the potential harm to the patient was real and substantial and that the incident was serious. Orlo herself testified before the administrative law judge that there was no excuse for the error. The maladministration of the sedative was her second mistake. Under the policy followed by Edgewood, discharge would seem to be the only reasonable reaction to the incident.

The Board, however, concluded that certain evidence indicated that the investigation was not conducted entirely in good faith. The majority cited the failure to solicit the opinion of Dr. Doherty, the patient's attending physician, to determine the actual and potential harm to the patient as a result of the error. The Board found that Dr. Doherty would have been in a better position than Dr. Blair to judge this matter. The dissenting member reasoned that this fact would not support an inference of bad faith. He contended that the Center's reliance on its own medical director was sound.

While we must accept the evidence that Dr. Doherty was in a better position to judge the seriousness of the error in relation to his patient, we do not believe that the failure to contact him gives rise to a reasonable inference of bad faith. The policy of the Center called for the Medical Director, not the attending outside physician, to assess the gravity of the mistake. The Board did not question Dr. Blair's report that the error was in fact serious by his analysis. The majority further reasoned that the policy also called for the Administrator to solicit "other reports that might be relevant." This observation is unsupported by the record, which shows that Edgewood's policy indicated that other reports "from any supervisory personnel who may have been involved in the incident" might be considered. The record indicates that the only "supervisory personnel" involved was RN Caravaggio, whose report was considered.

To support its finding of bad faith the majority also relied on the fact that Orlo was not given a final interview and opportunity to resign, as had the nurse whose first, apparently innocent, medication error resulted in a patient's death. Considering the record in this case we do not believe that the want of these courtesies is substantial evidence that the investigation was in bad faith, or that the decision to discharge Orlo was based on anti-union sentiment. At most this evidence supports the already substantiated inference that Edgewood was not well disposed towards Orlo because of her union activity. The evidence does not rebut the conclusion that Orlo's employment would have been terminated irrespective of her union activities.

We find that the only reasonable conclusion which can be drawn from this record is that the sole cause for Orlo's discharge was her second medication error. There is no substantial evidence that this reason was merely a pretext. Even if Edgewood had a continuing antipathy towards Orlo because of her union activity, this predisposition played no part in the decision to discharge her. The evidence shows that the motive for Edgewood's action was solely its concern for its health care standards. Accord-

ingly, the Board's decision finding a violation of section 8(a)(1) and 8(a)(3) because of the decision to terminate Orlo's employment cannot be upheld.

The petition for review will be granted. We will enforce the Board's order insofar as it relates to a violation of section 8(a)(1) of the Act arising from the threat of economic retaliation. We will deny enforcement of the order relating to the finding of a violation of sections 8(a)(1) and 8(a)(3) relating to the discharge of Dona Orlo.