NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GENERAL WAREHOUSE
CORPORATION,
Respondent.

No. 80–1472.

United States Court of Appeals,
Third Circuit.

Argued Dec. 1, 1980.
Decided March 10, 1981.

---

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

The National Labor Relations Board (hereinafter the "Board") petitions this court for enforcement of its February 14, 1980 order against General Warehouse Corporation (hereinafter the "Company").[1] The Board found General Warehouse in violation of sections 8(a)(1) and (3) of the National Labor Relations Act (hereinafter the "Act")[2] for retaliating against its employee, John Coon, for engaging in protected union activities. It therefore ordered respondent, General Warehouse, to cease and desist from its unfair labor practices and to reinstate Coon with back pay. Respondent contends that the Board's order should not be enforced because the Board failed to defer to an arbitrator's award that ruled that there was "just cause" for Coon's dismissal; alternatively, respondent argues that there is insufficient evidence on the record to support the Board's findings. We hold that because the arbitrator's decision addressed only the contractual questions in the dispute and not the statutory issues brought before the Board, it was not an abuse of discretion for the Board to refuse to defer to the arbitrator. We also conclude that there is substantial evidence on the record to support the Board's unfair labor practices findings. Accordingly, we will enforce the Board's order.

Joseph Schwachter (argued), Elliott Moore, Paul J. Spielberg, William A. Lubbers, John E. Higgins, Jr., Robert E. Allen, Washington, D.C., for petitioner.

Herbert New (argued), Brenner, New & Brenner, Livingston, N.J., for respondent.

Before ALDISERT, HUNTER and HIGGINBOTHAM, Circuit Judges.

## FACTS

The events leading to the unfair labor practices in this case began in January, 1978. At that time, General Warehouse's Executive Vice-President, Philip Fine, held a meeting with the Company's employees. He asked the employees to waive their contractual right to bid on work to be performed in a new warehouse.[3] John Coon, a

---

1. The Board's order is reported at 247 NLRB No. 142 (1980), *reprinted in* Appellant's Appendix at 231–33.

2. 29 U.S.C. § 158(a)(1), (3) (1976).

3. Under a collective bargaining agreement between General Warehouse and the warehouse employees, employees were entitled to bid for transfers to different warehouses according to their seniority. At the January, 1978 meeting Fine informed the employees that a prospective

warehouseman for General Warehouse, attended the meeting but did not participate in the discussion. After the meeting, Fine approached Coon and asked him to "speak to the men and try to get across to them how important it was that [they] agree to [give] up the bid." Coon declined. He had battled with the Company before in a 1976 campaign to collect contractual wage increases that the employees had been persuaded to waive. When he told Fine that he would again oppose the Company, Fine informed Coon that the Company considered him to be a "troublemaker" and "instigator."

Soon thereafter, in March, 1978, the President of General Warehouse, Michael Goldfarb, called another meeting of the warehouse employees. He told them that due to the high cost of energy and the Company's poor financial condition, he could not afford to pay the 38-cent-an-hour cost of living increase provided for under the collective bargaining agreement. He asked the employees to waive the increase due to take effect on April 1, 1978. Goldfarb said he had owned a company in the past where he had labor trouble, that he had closed the business, and that he could do it again. He also told the employees that if they did not waive the cost of living increase due to them, he would close down the Company and open elsewhere.

At least five employees, including Coon, spoke out against waiving the increase. Coon said that the employees were also suffering from inflation and that they were not to be blamed for the Company's unfavorable position with its competitors. He insisted that Goldfarb live up to the contract he had signed.

Coon continued to voice his opposition to a waiver of the cost of living increase through the end of March. On March 30 or 31, the Company polled the employee units on their position.[4] The waiver proposal was defeated.

Immediately upon the defeat of the waiver issue, General Warehouse changed its work assignment policy. Ordinarily, General Warehouse would assign employees to unload Wrigley freight cars, an arduous job described as the "least desirable assignment at the plant,"[5] on a rotational basis. After its waiver issue was defeated, the Company arbitrarily selected the employees for the job. It assigned Coon to the Wrigley work on April 3, 1978 and April 4, 1978. On April 5, 1978, Coon called in sick. He was discharged that same day for excessive absenteeism.

The evidence shows that Coon did not have a model attendance record. At one time, he had been absent 18% of his working days; at another, he was sent a warning that his absence five Fridays out of seven was unsatisfactory. The ALJ in his opinion carefully details Coon's attendance record.[6] We agree with his conclusion that "[the fact that Coon] was absent a considerable number of times is amply supported by the record." ALJ's Decision at 7, *reprinted in* Appendix at 224. We also agree, however, and will discuss below, that merely "because justifiable grounds for discharge existed, it does not necessarily follow [that] such was the motivating reason [for the dismissal]." *Id.*

## PROCEDURAL HISTORY

The Union filed a grievance with General Warehouse on behalf of Coon, alleging that

---

customer wanted to "hand pick" his warehouse workers and would be more likely to lease the warehouse from General Warehouse if the Company were to release him, with the approval of the employees, from the terms of the collective bargaining agreement.

4. The ALJ was unclear on whether the stewards' poll was conducted on March 30 or 31. *See* ALJ's Decision at 6 n.14, *reprinted in* Appendix at 223.

5. ALJ's Decision at 6, *reprinted in* Appendix at 223. *See also* Transcript of ALJ proceedings,

*reprinted in* Appendix at 101–02. Prior to 1976, the Company had used this assignment as a form of punishment for employees who, for one reason or another, had fallen into disfavor with the Company. Transcript of ALJ proceedings, *reprinted in* Appendix at 41, 78. In 1976, upon the Union's request, the Company agreed to rotate this work among the warehousemen. *See* ALJ's Decision at 6, *reprinted in* Appendix at 223.

6. ALJ's Decision at 7–8, *reprinted in* Appendix at 224–25.

his discharge had been in retaliation for his union activities and did not constitute "just cause" under the collective bargaining agreement. In accordance with the collective bargaining agreement, the parties submitted their dispute to arbitration. The arbitrator heard argument on the possible motives for Coon's discharge, but made no finding on whether the discharge was based, even in part, on General Warehouse's hostility toward Coon's union activities. Rather, the arbitrator focused only on Coon's behavior and found that his excessive absenteeism was "just cause" under the collective bargaining agreement for his dismissal.[7]

After the arbitrator's decision, Coon filed a complaint with the Board alleging that respondent interfered with the exercise of his section 7 rights [8] (a section 8(a)(1) violation) and discriminated against him in his tenure and condition of employment (a section 8(a)(3) violation). A hearing was held before an Administrative Law Judge (hereinafter "ALJ") on February 21, 1979. The ALJ, declining to defer to the arbitrator's decision, concluded that Respondent had engaged in the alleged unfair labor practices. Accordingly, he recommended that General Warehouse be ordered to cease and desist from its discriminatory acts and reinstate Coon with backpay. The Board summarily adopted the ALJ's order.

## DISCUSSION

Our decision on whether to enforce the Board's order turns on two important issues. First, we must decide whether the Board properly refused to defer to the arbitrator's decision in this case. Second, if we hold that the Board did not abuse its discretion in refusing to defer, *NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 372 (3d Cir. 1980),[9] we must determine whether there is substantial evidence on the record to support the Board's finding that respondent violated sections 8(a)(1) and (3) of the Act. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 491, 492–96, 71 S.Ct. 456, 464, 466, 467–68, 95 L.Ed. 456 (1951).

### I.

■ In *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), the Board set forth its standards for deferring to arbitrators' awards.[10] It stated that it would defer to an arbitrator's award if: (1) the proceedings have been fair and regular; (2) the parties agreed to be bound; and (3) the decision was not "clearly repugnant" to the purposes and policies of the Act.[11] *Spielberg*, 112 N.L.R.B. at 1082. The parties have stipulated to the first two of these requirements. The Board refused to defer because it found that the third requirement had not been met. Although we agree with the Board's conclusion that it was not required to defer in this case, we choose to

7. *See* Arbitrator's decision, *reprinted in* Appendix at 181(b)–181(e) & note 19 *infra*.

8. 29 U.S.C. § 157 (1976). *See* note 22 *infra*.

9. *See also Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674, 676 (9th Cir.), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1976) ("abuse of discretion" standard of review).

10. These standards bind the Board and this court. Although the Board's policy of deferral is a "discretionary administrative doctrine," *see Pincus*, 620 F.2d at 372 n.8, once the Board "announce(s) a policy regarding deference to arbitration, (it cannot) blithely ignore it, thereby leading astray litigants who depended on it." *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2d Cir. 1971). Accordingly, we believe it proper to use the Board's own standards to gauge whether it abused its discretion

in refusing to defer. *See Hawaiian Hauling*, 545 F.2d at 676.

11. The *Spielberg* requirements were designed to achieve the "desirable objective of encouraging the voluntary settlement of labor disputes...." *Spielberg*, 112 N.L.R.B. at 1082. Since its introduction, arbitration has served to promote industrial peace and stability by encouraging the private resolution of disputes. *See generally*, International Harvester, 138 N.L.R.B. 923 (1962); Murphy & Sterlacci, *A Review of the National Labor Relations Board's Deferral Policy*, 42 Ford L.Rev. 291 (1973). Correspondingly, the courts continue to support the Board's deferral policy. *See Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1963); *NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 372–74 (3d Cir. 1980).

base our decision on a fourth requirement—a prerequisite to the *Spielberg* standards—articulated by the Board in *Raytheon Co.*, 140 N.L.R.B. 883 (1963), *enforcement denied on other grounds*, 326 F.2d 471 (1st Cir. 1964).

In *Raytheon Co.*, the Board held that it would not defer to an arbitrator's decision if the arbitrator failed to consider and rule on the unfair labor practice issue.[12] *See also Max Factor & Co.*, 239 N.L.R.B. 804 n.3 (1978) (noting that both the Board and the courts have taken the position that the Board should not defer when the arbitrator has not considered the statutory issues). The Board found that

It manifestly could not encourage the voluntary settlement of disputes or effectuate the policies and purposes of the Act to give binding effect in an unfair labor practice proceeding to an arbitration award which does not purport to resolve the unfair labor practice issue which was before the arbitrator and which is the

very issue the Board is called upon to decide in the proceeding before it.

*Raytheon*, 140 N.L.R.B. at 884, *quoting Monsanto Chemical*, 130 N.L.R.B. 1097, 1099 (1961).[13] We agree with the Ninth Circuit that

It is illogical for the Board, which is responsible for resolving the unfair labor practice issue, to defer to a decision by an arbitrator, who is under no duty and indeed may not be particularly predisposed to consider the statutory issue, solely on the basis of a factually unfounded presumption that the arbitrator had considered the issue.

*Stephenson v. NLRB*, 550 F.2d 535, 540 (9th Cir. 1977).[14] Rather, in order for the Board's deferral policy not to be one of abdication,[15] the Board must be presented with some evidence that the statutory issue has actually been decided.[16]

In applying the fourth deferral requirement—that the arbitrator consider the statutory issue and rule on it or all the facts required to decide it [17]—to the facts of the

---

12. Several courts have chosen to integrate this fourth requirement from *Raytheon* into their analysis of whether the third *Spielberg* requirement has been met. These courts hold that the arbitrator's failure to consider and rule on the statutory issue actually leads to a decision clearly repugnant to the Act and thus a failure to meet the third *Spielberg* requirement. *See, e. g., Bloom v. NLRB*, 603 F.2d 1015 (D.C.Cir. 1979); *Dreis & Krump Mfg. Co., Inc.*, 544 F.2d 320 (7th Cir. 1976); *Banyard v. NLRB*, 505 F.2d 342 (D.C.Cir.1974). We decline to follow this mode of analysis both because we want to emphasize the importance of this separate requirement, *see Pincus*, 620 F.2d at 372 n.7 (*Raytheon* requirement noted as an added requirement to those in *Spielberg*) and because the history of the third *Spielberg* requirement suggests that it was intended to cover the more specific situation where the arbitrator's decision, on its face, conflicts with the Act. *See generally* R. Gorman, Basic Text On Labor Law 736–37 (1976).

13. The Board has recently reaffirmed this requirement in Suburban Motor Freight, Inc., 247 N.L.R.B. No. 2 (Jan. 8, 1980), eliminating any doubt that a finding of just cause does not automatically dispose of a claim of discriminatory motive.

14. *See* note 16 *infra*.

15. Regardless of its deferral policy, the Board retains the primary responsibility and power to adjudge unfair labor practices. Section 10(a) of the Act, 29 U.S.C. § 160(a) (1976). *See also Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964).

16. The Board's fourth requirement will be deemed met "[i]f there is substantial and definite proof that the unfair labor practice issue and evidence were expressly presented to the arbitrator *and [that] the arbitrator's decision indisputably resolve[d] the [unfair labor practice] issue. . . .*" *Stephenson*, 550 F.2d at 538 n.4 (emphasis added). If "the arbitrator's decision is ambiguous as to the resolution of the statutory issue, [we must hold that] the 'clearly decided requirement has not been met.'" *Id.*

17. *See Pincus*, 620 F.2d at 372 n.7. *See also St. Luke's Memorial Hospital, Inc. v. NLRB*, 623 F.2d 1173, 1178–79 (7th Cir. 1980) (finding of "just cause" for discharge does not dispose of issue of discriminatory motive); *Bloom v. NLRB*, 603 F.2d 1015, 1020 (D.C.Cir.1979) ("[T]he record must yield clear indication that the arbitration panel specifically dealt with the issues underlying the unfair labor charge. . . ."); *Stephenson*, 550 F.2d at 538 ([B]efore deferral can be held proper . . . the arbitral tribunal must have *clearly decided* the

instant case, we find that the Board refused to defer to the arbitrator's decision, not because it disagreed with the arbitrator's finding that excessive absenteeism constituted "just cause" under the collective bargaining agreement for discharge, but because the arbitrator did not rule on whether there may have been other grounds for the discharge.[18] The arbitrator's decision *only* discussed Coon's poor attendance record and whether his excessive absenteeism constituted "just cause" under the collective bargaining agreement for his discharge. The arbitrator could, and apparently did, make his decision without considering the Company's other possible motives for discharging Coon.[19] These other motives, if found to be discriminatory and the "real cause" of Coon's dismissal, could form the basis of an unfair labor practices charge.

Therefore, we cannot find that the Board abused its discretion by refusing to defer to the arbitrator's award.[20] Since the Board

---

unfair labor practice issue which the Board is later urged to give deference...."").

18. The arbitrator wrote:

*ISSUE SUBMITTED*

Was there just cause under the terms and conditions of the collective bargaining agreement for the discharge of John Coon? If not, what shall the remedy be?

*NATURE OF THE CASE*

The grievant was terminated by the Company on the grounds of excessive absenteeism following a progression of discipline which included a written warning and a suspension for absenteeism. The Union grieved the termination, and the parties being unable to resolve their dispute, the Union sought arbitration.

*DISCUSSION*

Among the primary obligations of an employee is the duty to present himself for work on a reliable, dependable basis. Although every worker falls prey to illnesses which make occasional absences unavoidable, excessive absenteeism disrupts the ability of the Company to function effectively and thereby reduces the job security of all employees. Although it is unfortunate indeed that the grievant experienced debilitating back problems after a few difficult assignments, his record reflects many more absences than could reasonably be tolerated. The impact of this level of absenteeism was compounded by the failure of the grievant on many occasions to reach the proper Company official in order to report his absence in a timely manner.

The Company had alerted the grievant to its dissatisfaction with his attendance record through a series of increasingly severe disciplinary sanctions in keeping with the well-accepted tenets of progressive discipline which endeavor to make employees more secure in their jobs by alerting them to their employer's dissatisfaction in time to correct their behavior and avoid being discharged.

Several warning letters followed by a suspension served without appeal after it had been reduced in length through Union intervention gave the grievant ample warning of the imminence of termination unless his at-

tendance record improved. There is no record of such improvement. Therefore, based on the clear thrust of the facts in evidence and the credible testimony, there was just cause for the discharge of John Coon. The grievance is denied.

19. We are also concerned that even if the arbitrator did implicitly decide the statutory issue, he did so by using the wrong legal standard. "Just cause" is to be determined by the terms of the collective bargaining agreement. The arbitrator may or may not take into account all motives for the discharge. Section 8(a)(1) and (3) violations, on the other hand, are to be adjudged in accordance with judicial standards and must take into account both the employer's justifiable cause to discharge the employee and its possible discriminatory motive. *See* text accompanying notes 24–27 *infra. See also Banyard v. NLRB,* 505 F.2d 342, 348 (D.C.Cir. 1974); Note, 88 Harv.L.Rev. 804, 808 (1975). Without a specific mention in the arbitrator's decision to the other possible motives for Coon's discharge, this court must assume, as did the Board, that the arbitrator's decision was based on the narrow, one-sided focus of the contract's "just cause" standard. *Cf. Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56–57, 94 S.Ct. 1011, 1023–24, 39 L.Ed.2d 147 (1974) (The court noted that the arbitrator's primary duty is to effectuate the intent of the parties to the contract rather than the requirements of law).

20. Our decision in the instant case is consistent with this court's recent holding in *NLRB v. Pincus,* 620 F.2d 367 (3d Cir. 1980). In *Pincus,* this court held that the Board was required to defer because the arbitrator's decision was arguably consistent with the Act. In that case, the statutory issues were whether an employee was terminated for writing and distributing a leaflet and whether that activity was protected under the Act. The arbitrator discussed all the facts relevant to these issues, found that the leaflet activity was one cause of the employee's discharge, but found that the conduct fell outside the limits of the Act's protection; he there-

did not have the aid of an arbitrator's decision addressing the alleged discriminatory motive, it was required to make a determination itself. We now examine its decision.

## II.

■ The Board found that General Warehouse violated sections 8(a)(1) and (3) of the Act by assigning Coon to the "Wrigley work" in retaliation for his protests against the Company's waiver proposal. Coon's protests at the March, 1978 meeting were protected as concerted activity, *see Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1348 (3d Cir.), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1969), under section 7 of the Act.[21] Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976), of the Act safeguards Section 7's guarantee by providing that "It shall be an unfair labor practice for an employer—to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7] of this title...." Section 8(a)(3) adds to this protection by holding that: "It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to ... discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3) (1976). The Board found General Warehouse in violation of both of these provisions.

We are limited in our review of National Labor Relations Board decisions. If the Board's findings are supported by substantial evidence on the record, we are obliged to enforce them. *Universal Camera*, 340 U.S. at 488, 491, 492–96, 71 S.Ct. at 464, 466, 467–68. We are also bound to respect the Board's conclusions on credibility and conflicting evidence if they take into account all relevant factors and are sufficiently explained. *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *NLRB v. New York—Keansburgh Long Branch Bus Co., Inc.*, 578 F.2d 472, 478 n.15 (3d Cir. 1978). Bound by this standard, and based upon our independent review of the record, we conclude that there is substantial evidence to support the Board's order.

The record shows that in January, 1978 a Company representative warned Coon that he was considered to be an "instigator" and "troublemaker" because of his 1976 efforts to secure employee benefits. In March, 1978, when Coon had an opportunity to redeem himself with the Company, he instead chose to fight its cost of living increase waiver proposal. On March 30, immediately after its waiver proposal had been defeated, the Company announced that employees would no longer be granted working time to cash paychecks and that the rotation system for "Wrigley work" assignments would be changed to one in which the employer could arbitrarily pick employees to be saddled with the unpleasant task.

Considering this setting, the Board found that the mood and timing of Coon's assignment to "Wrigley work"[22] supported the charges of discrimination. The ALJ wrote:

---

fore upheld the discharge. The Board, relying on the same facts as did the arbitrator, concluded that the employee's leaflet activity was protected and thus refused to defer.

By contrast, in the instant case there was neither a ruling on the unfair labor practice issue nor any indication in the arbitrator's decision that he even considered the statutory issue. Rather, it appears from the arbitrator's opinion that his decision on the contractual issue was based solely on Coon's conduct, without reference to the employer's other possible motives for the discharge.

Furthermore, contrary to respondent's suggestion, our decision does not conflict with the Ninth Circuit's judgment in *Douglas Aircraft Co. v. NLRB*, 609 F.2d 352 (9th Cir. 1979). As distinguished from the arbitrator's decision in *Douglas*, the arbitrator's decision in the instant case did not refer to all of the employer's possible motives for the discharge. Consequently, there is no reasonable basis for holding that the arbitrator must have implicitly found them to be the "real cause" and not pretexts for Coon's dismissal.

**21.** Section 7 of the Act, 29 U.S.C. § 157 (1976) provides, "Employees shall have the right ... to engage in other concerted activities for the purposes of collective bargaining or [their] other mutual aid or protection...."

**22.** Coon was assigned to the "Wrigley work" just two working days after the steward's poll.

[Coon] had been a vociferous opponent to waiving the cost of living increase at the meeting conducted by Goldfarb in early March. The Respondent also was aware he had been instrumental in retaining an attorney about 2 years before to attempt to collect wages due to the employees under the collective bargaining contract. Although not exempt from Wrigley assignments, I am of the view the assignment of the Wrigley work to Coon on the heels of the employees' rejection of the Respondent's request they waive the cost of living increase was in retaliation for such rejection.

ALJ's Decision at 6–7, *reprinted in* Appendix at 223–224.

Although we might make a different decision if we were to decide the case *de novo*, as stated earlier, we must defer to the Board's decision if it is substantially supported by the record. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464. As described above, there is such support. The ALJ could reasonably infer from the evidence that Coon was assigned to the Wrigley work, three days in a row, because of his opposition to the Company's waiver proposal. He was further justified in finding that the Company's action was designed to coerce Coon and the other employees into accepting future waiver proposals. Accordingly, we hold that there is substantial evidence on the record to find that Coon's assignment to the Wrigley work was a violation of sections 8(a)(1) and 8(a)(3) of the Act.

The Board also found that General Warehouse violated section 8(a)(1) and 8(a)(3) of the Act by discharging Coon in retaliation for his opposition to the waiver proposal. As this Court wrote in *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978): "Whether the employer's discharge of an employee violates section 8(a)(1) and 8(a)(3) of the Act depends on the employer's motive. *N. L. R. B. v. Brown*, 380 U.S. 278, 283, 85 S.Ct. 980 [983] 13 L.Ed.2d 839 (1965); *N. L. R. B. v. Eagle Material Handling, Inc.*, 558 F.2d 160, 169 (3d Cir. 1977)."

General Warehouse contends that Coon was discharged because of his excessive absenteeism. The Board takes the position that Coon was discharged because of his opposition to the Company's waiver proposal.

Our goal is to find the "real motive," *NLRB v. Brown*, 380 U.S. at 287, 85 S.Ct. at 985; *NLRB v. Gentithes*, 463 F.2d 557, 560 (3d Cir. 1972) or "real cause," *NLRB v. Rubber Rolls, Inc.*, 388 F.2d 71, 74 (3d Cir. 1967) for Coon's dismissal. In *Edgewood Nursing*, we were faced with a similar problem. The Board contended that the employee had been unlawfully discharged because of her union activities. The employer, on the other hand, alleged that its nurse had been dismissed because she had made serious medication errors. In deciding which explanation to accept, this court proposed the following test for dealing with "dual-motive" cases:

> If two or more motives are behind a discharge, the action is an unfair labor practice if it is partly motivated by reactions to the employee's protected activity.... On the other hand, if the employee would have been fired for cause irrespective of the employer's attitude toward the union, the real reason for the discharge is non-discriminatory. In that circumstance there is no causal connection of any anti-union bias and the loss of the job.... Thus, if the employer puts forward a justifiable cause for discharge of the employee, the Board must find that the reason was a pretext, and that anti-union sentiment played a part in the decision to terminate the employee's job.

*Edgewood Nursing*, 581 F.2d at 368 (citations omitted).

The *Edgewood* standard is designed to be applied on a case-by-case basis. While in several of our recent cases we have applied this standard and found that there is not substantial evidence to support the unfair labor charge,[23] we cannot come to the same

---

**23.** *See, e.g., Stein Seal Co. v. NLRB*, 605 F.2d 703, 709 (3d Cir. 1979); *Edgewood*, 581 F.2d at 366–71.

conclusion here. In the case before us, the ALJ details why he found Coon's excessive absenteeism to be a mere pretext for his dismissal.[24] Although the pressure against Coon to improve his attendance record had been mounting for a while, General Warehouse chose to dismiss Coon at the very moment when his discharge would have the maximum coercive and punitive effect. The Company took absences that had previously been condoned[25] and used them as a reason for dismissing Coon. When General Warehouse finally "lowered the boom" on Coon, it did not give him a chance to explain his absences. If it had, it would have found evidence of a possible legitimate excuse for his absence on the day he was discharged.[26]

Once again, although we might have decided the case differently *de novo*, there is substantial evidence on the record to support the Board's finding that the Company's hostility towards Coon's protected activities was the "real cause" for his dismissal. The timing of Coon's discharge, the Company's previous attitude toward him and his union efforts, and the almost reflexive resort by the Company to Coon's past attendance record all support the Board's conclusion.

There will necessarily be "close calls" in cases involving a discharge alleged to be in violation of section 8(a)(1) and 8(a)(3). This case is one of them. However, in light of the extensive record compiled by the Board, its credibility findings,[27] and our own reading of the evidence, we find that General Warehouse would not have discharged Coon when it did if it were not for his opposition to their waiver proposal.

Accordingly, we will enforce the Board's decision ordering General Warehouse to cease and desist from its unfair labor practices and to reinstate John Coon with back pay.[28]

ALDISERT, Circuit Judge, dissenting.

The majority have determined that the National Labor Relations Board did not abuse its discretion[1] by refusing to defer to an arbitrator's decision in a contract dispute grounded on the same facts precipitating the unfair labor practice charge. They further hold that substantial evidence supports the Board's conclusion that General Warehouse Corporation violated §§ 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3). I disagree on both counts.

I.

In analyzing the Board's refusal to defer to the arbitrator, the majority appear to minimize a stipulated fact that I consider extremely important: General Warehouse and the union[2] raised and introduced testimony on the issue of unlawful discrimina-

---

24. ALJ's Decision at 7, *reprinted in* Appendix at 225. Although the ALJ does not use the term "pretext," his statement, "I am convinced Coon was discharged, not for his absences, but in retaliation for the opposition by the employees to waive the cost of living increase and Coon's known participation in such rejection" may be considered an equivalent statement.

25. *See* ALJ's Decision at 7, *reprinted in* Appendix at 224.

26. *See* ALJ Decision at 8, *reprinted in* Appendix at 225 (ALJ, crediting Mrs. Coon's credibility over that of respondent's warehouse manager, found that the Company had been informed of Coon's medical excuse for being absent on the day he was discharged). *See also* General Counsel Exhibit 11, *reprinted in* Appendix at 214. Respondent's January 4, 1977 letter acknowledging that Coon had been under a doctor's order not to work.

27. *See* ALJ's Decision at 8, *reprinted in* Appendix at 225.

28. *See* complete text of ALJ's Recommended Order, adopted by the Board, *reprinted in* Appendix at 228–29.

1. Until today, the appropriate scope of review of Board orders refusing to defer to arbitrators had been unsettled in this court. *Compare NLRB v. Pincus Brothers, Inc.—Maxwell*, 620 F.2d 367, 372 (3d Cir. 1980) (Rosenn, J., opinion announcing judgment of the court), *with id.* at 380–81 (Garth, J., concurring). Even under the abuse of discretion standard employed by the court today, however, I believe that the Board's order should not be enforced.

2. Union Local 641, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

tion before the arbitrator.[3] Although the arbitrator did not explicitly address the issue in his memorandum, the majority's conclusion that the arbitrator failed to consider the evidence reflects an unjustifiable interpretation of his award.

This court's decision today ultimately must reconcile the arbitrator's decision that "there was just cause for the discharge of John Coon" with the Board's decision[4] that General Warehouse discharged Coon for discriminatory purposes in violation of §§ 8(a)(1) and (3). If the arbitrator's decision means that just cause *existed* for the discharge and also that the discharge was *for* just cause, then it must logically follow that the arbitrator implicitly considered and rejected Coon's argument that the discharge was *for* an illicit cause. Such a conclusion would be in full accord with the case law of this court on "dual motives," *see Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978) ("if the employee would have been fired for cause irrespective of the employer's attitude toward the union, the real reason for the discharge is nondiscriminatory."); it would also mandate deferral to the arbitrator's decision by the NLRB, *see, e. g., Suburban Motor Freight, Inc.*, 247 N.L.R.B. No. 2, slip op. at 4, [1979–80] CCH N.L.R.B.Rep.

¶ 16,648, at 31,080 (1980) (for deferral, unfair labor practice issue must have been "both presented to and considered by the arbitrator."). Moreover, a Board decision that the employer had committed an unfair labor practice by discriminatorily discharging Coon would be factually irreconcilable with the arbitrator's decision that the discharge was *for* just cause.

To reconcile the Board's order with the arbitrator's decision is to require a crabbed interpretation of the arbitrator's decision, an interpretation contrary to Board decisions and ruling case law. Under *Edgewood Nursing Center*, "if the employer puts forward a justifiable cause for discharge of the employee, the Board must find that the reason was a pretext...." 581 F.2d at 368. To be consistent with the Board's finding of a pretextual dismissal in this case, the arbitrator's finding of "just cause" for dismissal must be totally devoid of a causal relationship to the discharge. If the arbitrator found "just cause" and stopped short of relating that cause to the dismissal, then and only then can the two positions become reconcilable. It would be a bizarre interpretation indeed to conclude that the arbitrator stopped so short, yet so far away, from his duty to resolve the dispute before him.[5] Yet that is precisely the scenario the

**3.** Before the administrative law judge, Martin J. Brenner, attorney for General Warehouse, and Paul A. Montalbano, attorney for the General Counsel of the Board, stated:

> MR. BRENNER: It is further stipulated that the issue of discrimination for both Mr. Coon's alleged concerted action and with regard to the Wrigley loads was raised and testimony was adduced on both of those facets of alleged discrimination at the arbitration hearing held before the New Jersey State Board of Mediation on June 22, 1978.
> MR. MONTALBANO: General Counsel so stipulates.
> [ADMINISTRATIVE LAW JUDGE]: I'm not sure I heard that fully with respect to the issue of concerted action. Do you want to repeat that part of it?
> MR. BRENNER: Yes, that the issue was raised and that evidence was adduced on both sides with regard to the allegation of discrimination against Mr. Coon and discharge of Mr. Coon because of ... his concerted actions and activities with regard to the union and the work conditions of the men.

> MR. MONTALBANO: Judge, in that stipulation General Counsel would like it to be noted that ... General Counsel enters into the stipulation with the understanding that the stipulation does not ... go to ... the weight or the quality of entering the evidence which was adduced, that the report may have been adduced at the arbitration, there's been no record of it, but the stipulation merely should be interpreted and given the weight as it appears the issue was raised and some testimony ... was adduced on the issue.
> [ADMINISTRATIVE LAW JUDGE]: You're not contending, I understand it, that it was not a fair hearing are you?
> MR. MONTALBANO: No we're not.

App. at 49–50.

**4.** The Board adopted the recommended order of the administrative law judge. 247 N.L.R.B. No. 142, *reprinted in* App. at 231.

**5.** This interpretation does not accord even with the language of the contract. Article 47 of the collective bargaining agreement states in part

Board has fashioned for this court, and the majority have accepted it.

This implausible interpretation of the arbitrator's decision, to be sure, runs counter to the linchpin of labor litigation: the courts must show proper deference to labor arbitration. The Supreme Court cautioned in the *Steelworkers Trilogy* that

> [a]rbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

*United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (footnote omitted); *see also Douglas Aircraft Co. v. NLRB*, 609 F.2d 352, 355 (9th Cir. 1979). Simply put, the Supreme Court has ordered the federal judiciary and the federal administrative agencies to avoid nitpicking arbitral opinions, thereby diluting the power of the arbitrators and discarding the finality due consensual arbitration.

By assuming that the arbitrator found the existence of "just cause" for dismissal in Coon's excessive absenteeism, yet failed to determine that this excessive absenteeism was the cause of the dismissal, the Board has interpreted the arbitrator's award in the most unfavorable light, and has construed the award by resolving all inferences against the effectiveness of arbitration. I disagree strongly with this approach because it runs counter to our national labor policy favoring arbitration of disputes.

In my view, the proper way to interpret any arbitration award is to assume, absent some substantial countervailing indication, that the arbitrator did his job. In this case, his job was to determine not only whether Coon was excessively absent, a point not seriously contested, but more important whether General Warehouse actually discharged him for that reason. If this eminently reasonable assumption is entertained, the only conclusion to be drawn from the arbitrator's order and accompanying memorandum is that Coon was discharged for excessive absenteeism. Under this interpretation, the arbitrator's decision can be "arguably reconciled with the policies of the Act," *NLRB v. Pincus Brothers, Inc.—Maxwell*, 620 F.2d 367, 375 (3d Cir. 1980) (Rosenn, J., opinion announcing judgment of the court). Board deferral is required in this situation under *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955).[6]

Accordingly, I would hold that the NLRB abused its discretion in refusing to defer to the arbitrator, and I would deny enforcement.

## II.

I now turn to the determination of whether the Board's findings of fact are supported by substantial evidence on the record as a whole. The proper focus is on what I believe to be the crucial finding supporting the Board's decision, as phrased by the majority: "[t]he Company took absences that had previously been condoned

---

that "[t]he Employer shall not discharge nor suspend any employee without just cause and the written notice of discharge or suspension must set forth the specific reason(s) for such action." New Jersey-New York Area General Trucking Supplemental Agreement, Art. 47, § 1, *reprinted in* App. at 189. By arguing that Coon's discharge resulted from other motivations, the union evidenced its understanding that to satisfy the agreement the discharge must be causally connected to the "just cause."

**6.** In *Spielberg*, the Board indicated that deferral is appropriate when "the proceedings appear to

have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." 112 N.L.R.B. at 1082. Today the majority adopt a fourth requirement for Board deferral, that the unfair labor practice was both submitted to and considered by the arbitrator. Maj. op., at 968–969. I do not disagree with the selection of this precept, but, as my analysis shows, I believe it has been incorrectly interpreted and applied in this case.

and used them as a reason for dismissing Coon." Maj. op., at 973. Supporting this statement is the opinion of the administrative law judge:

[General Warehouse] contends [Coon] was discharged because of excessive absences, the most recent being on April 4. That he was absent a considerable number of times is amply supported by the record. But because justifiable grounds for discharge existed, it does not necessarily follow such was the motivating reason. The entire record must be examined.... By letter dated November 22, the Respondent pointed out to Coon he had been absent on November 2, 16–18. Coon was suspended without pay for one week[,] later changed to 2 days—December 5 and 6. (G.C. Ex. 10 and 13) Respondent's records show he was out 14 work days in 1978 prior to his April 5 absence when he was discharged—January 5–6, 13, 16–19, February 13 and 20, March 6, 14–17. The record further shows he called in to report his absence on only three of these occasions. (G.C. Ex. 3A) Yet after his suspension in early December 1977, he received no written or oral warnings. And then the Respondent lowered the boom on him when he was absent on April 5.

ALJ's mem. op., typescript at 7, *reprinted in* app. at 224. Considering the undisputed poor attendance record of Coon in light of the other circumstances existing up to the time of the discharge, I find the conclusion that General Warehouse condoned Coon's prior absences unsupportable on this record.

The undisputed evidence before the ALJ does not show condonation. The employer's past practice indicates that a three month interval between warning letters was not unusual. The first warning to Coon on July 2, 1976, covered the period April to July 1976 (three months). A letter of December 1, 1976, covered October and November (two months). Another letter on September 1, 1977, covered January through August (eight months). Although the penultimate letter of November 22, 1977, covered four absences in November, it followed the previous letter by over two months. ALJ's

mem. op. at 7, *reprinted in* app. at 224. By that letter, Coon was suspended for two days without pay in December, 1977, and neither the union nor Coon challenged the propriety of that action. During the first three months of 1978, Coon had been absent fourteen days, but had called in to report his intention to be absent on only three of those occasions. The dispatch of four warning letters—from July 1976 to November 1977—plus a suspension in December 1977 to me does not represent condonation. It reflects dissatisfaction and use of every sanction available to the company except the ultimate one—dismissal. The company's hesitance in invoking the ultimate sanction is consistent with the intervals it waited to impose the lesser sanctions.

But further, by concluding that the company condoned Coon's absenteeism over this three month period, the Board has erected a classic Catch-22 situation. If the employer had discharged Coon during the wage dispute, it would have subjected itself to charges of attempting to coerce a waiver of the cost of living increase. But by waiting until the dust had settled on the wage dispute to invoke its rights under the contract, the employer is held to have condoned the absences and has subjected itself to a charge of retaliation. I have no doubt that Mr. Coon will relish this irony all the way to the bank.

The finding of condonation is central to the ultimate decision. Without it, the record shows a persistent pattern of unexcused absences, continuing in disregard of the increasing sanctions imposed by the company. Absent evidence that less vocal employees with similarly poor attendance records were retained, a decision that General Warehouse discriminated against Coon must rely on more direct evidence of discrimination. That evidence, according to the ALJ, was the Wrigley work. *See* ALJ's mem. op., typescript at 8, *reprinted in* app. at 225. No inference arises from Coon's assignment to that work once, on April 3, but the ALJ deemed Coon's assignment to it a second consecutive day to be quite significant. The objection to the Wrigley work was not

handling that company's goods *per se*; the objection lay in the difficulty of manhandling heavy cartons of chewing gum.[7] The first day Coon performed the work, however, the cars contained only Wrigley display racks, not cartons of Wrigley gum. *See* ALJ's mem. op. at 5 n.11, *reprinted in* app. at 222 n.11.[8] Because his employer required him to perform the offensive work—unloading and stacking the packages of gum—only once, the union's claim that Coon received discriminatory work assignments lacks support in the record considered as a whole.

Greater awareness of, and sensitivity to, the "common law of the shop" regarding Wrigley work could have made the clear distinction between boxes of chewing gum and display racks determinative. Not surprisingly, the ALJ's failure to grasp this distinction has put him at odds with the decision of the arbitrator, in whom the parties have entrusted application of the "common law of the shop." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). This failure therefore offers additional support for deferral under *Spielberg*.

Accordingly, because I believe that the Board abused its discretion in refusing to defer to the arbitrator, producing an inconsistency between the arbitral award and the Board order, and because the Board's order is not supported by substantial evidence, I would refuse to enforce the order that John Coon be reinstated with backpay.

7. The General Counsel's brief notes:

The least desirable assignment at the plant, in the view of the warehousemen, was the job of unloading freight cars from Wrigley, one of the Company's customers. (A.223; 41, 101–102). The Wrigley cars are loaded with 40–45 pound cartons of gum which are slippery and tightly packed. They are stacked by hand, rather than with pallets. Because the cases are packed "very low," the one man assigned to the job is required to be "constantly bending to pick and lift the weight . . . all the time." (A.223; 41–42, 76, 100–101.)

Brief for Petitioner at 6.

8. Coon's testimony regarding the Wrigley work of April 3 indicates that the work was much less strenuous than usual:

MR. MONTALBANO: What was in the car Mr. Coon?

[MR. COON]: There were . . . wire racks that Wrigley uses to make their display stores.

Q Did the car have gum in it?

A No it had no gum.

[ADMINISTRATIVE LAW JUDGE]: Well was that strenuous work too?

[MR. COON]: Not half as bad, not one 10th as bad.

[ADMINISTRATIVE LAW JUDGE]: But was this in the same area that you described as an area where it was a form of punishment?

[MR. COON]: Yes sir.

[ADMINISTRATIVE LAW JUDGE]: But the work wasn't that difficult—Is that what you're telling us?

[MR. COON]: Not that car, no sir.

App. at 45–46.